```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
2                              WACO DIVISION

3    WSOU INVESTMENTS LLC          *    March 25, 2021
                                   *
4    VS.                           *    CIVIL ACTION NOS.
                                   *
5    GOOGLE LLC                    *    W-20-CV-571 thru 585

6              BEFORE THE HONORABLE ALAN D ALBRIGHT
                 TELEPHONIC SCHEDULING CONFERENCE
7
     APPEARANCES:
8
     For the Plaintiff:       James L. Etheridge, Esq.
9                             Brett Aaron Mangrum, Esq.
                              Brian Matthew Koide, Esq.
10                            Jeffrey Huang, Esq.
                              Ryan Scott Loveless, Esq.
11                            Etheridge Law Group, PLLC
                              2600 E. Southlake Blvd., Suite 120-324
12                            Southlake, TX 76092

13                            Mark D. Siegmund, Esq.
                              Law Firm of Walt Fair, PLLC
14                            1508 N. Valley Mills Drive
                              Waco, TX 76710
15
     For the Defendants:      Michael E. Jones, Esq.
16                            Potter Minton PC
                              110 N College, Suite 500
17                            Tyler, TX 75702

18                            Tharan Gregory Lanier, Esq.
                              Jones Day
19                            1755 Embarcadero Road
                              Palo Alto, CA 94303
20
                              Michael Lavine, Esq.
21                            Jones Day
                              555 California Street, 26th Floor
22                            San Francisco, California 94104

23                            Joseph M. Sauer, Esq.
                              Jones Day
24                            North Point, 901 Lakeside Avenue
                              Cleveland, Ohio 44114-1190
25
```

```
 1                              Tracy A. Stitt, Esq.
                                Jones Day
 2                              51 Louisiana Avenue, N.W.
                                Washington, D.C. 20001-2113
 3
                                Sanjiv P. Laud, Esq.
 4                              Jones Day
                                90 South Seventh Street, Suite 4950
 5                              Minneapolis, Minnesota 55402

 6                              Marlee R. Hartenstein, Esq.
                                Jones Day
 7                              500 Grant Street, Suite 4500
                                Pittsburgh, Pennsylvania 15219-2514
 8
                                Israel Sasha Mayergoyz, Esq.
 9                              Jones Day
                                77 West Wacker, Suite 3500
10                              Chicago, IL 60601

11                              Matthew Warren, Esq.
                                Jennifer A. Kash, Esq.
12                              Warren Lex LLP
                                2261 Market Street, No. 606
13                              San Francisco, CA 94114

14   Court Reporter:           Kristie M. Davis, CRR, RMR
                                PO Box 20994
15                              Waco, Texas 76702-0994
                                (254) 340-6114
16

17        Proceedings recorded by mechanical stenography, transcript

18   produced by computer-aided transcription.

19

20

21

22

23

24

25
```

09:01   1        (March 25, 2021, 9:01 a.m.)

09:01   2        DEPUTY CLERK:  Markman Hearing in Civil Actions

09:02   3   W-20-CV-584, 585, 571, 572, 573, 574, 575, 576, 577, 578, 579,

09:02   4   580, 581, 582, 583 and 584, all styled WSOU Investments LLC

09:02   5   versus Google LLC.

09:02   6        MR. SIEGMUND:  Good morning, Your Honor.  This is Mark

09:02   7   Siegmund for plaintiff WSOU Investments LLC.

09:02   8        Also with me this morning is James, also known as "Jim"

09:02   9   Etheridge.  We have Ryan Loveless.  And our three main speakers

09:03  10   today addressing the claim terms are going to be Mr. Brett

09:03  11   Mangrum, Jeff Huang and Brian Koide.

09:03  12        MR. JONES:  Your Honor, on behalf of defendant Google,

09:03  13   this is Mike Jones.  Our speakers will be Greg Lanier, Joe

09:03  14   Sauer, Michael Lavine, Sanjiv Laud, Marlee Hartenstein, Matt

09:03  15   Warren and Jen Kash.

09:03  16        And also on the line for Google itself, corporate

09:03  17   representatives are John Colgan, Joe Shear and Timur Engin.

09:03  18        And Mr. Lanier can tell you, if the Court desires, the

09:03  19   speakers that will speak as to the terms in the order that the

09:03  20   Court has provided to us.

09:03  21        Thank you, Your Honor.

09:03  22        THE COURT:  Thank you, Mr. Jones.  Thank you to the

09:03  23   clients who have taken the time to attend.

09:03  24        Let me apologize to those who are in California, if any

09:03  25   are.  We try to schedule these things so they're not so early,

4

09:03  1   but with the number of claim terms we have this morning, we

09:04  2   felt like we might need all day and we needed to get started by

09:04  3   9:00 to get done.

09:04  4        I'm told we have only 12 claim terms, which is still a

09:04  5   lot, so that's why we started at the time we did.

09:04  6        We will start with -- give me one second.  The first claim

09:04  7   term I believe that we're going to take up is "continuous-wave

09:04  8   Doppler radar."

09:04  9        Let me hear from counsel for defendant with respect to

09:04  10  anything they'd like to say on this claim term and its

09:04  11  construction.

09:04  12       MR. LANIER:  Thank you, Your Honor.  This is Greg Lanier

09:04  13  of Jones Day.  I am in California, but the sun is up, so we'll

09:04  14  survive just fine.  We do appreciate Your Honor accommodating

09:04  15  our request to do this by Zoom.

09:04  16       My partner Joe Sauer will handle this term.

09:04  17       THE COURT:  I worry that you are subliminally trying to

09:04  18  get me to your side by having a guitar hanging in the

09:05  19  background of your room.  I have some of those myself in

09:05  20  another room.  But I just wanted you to know it's not going to

09:05  21  work.  Even if you have a guitar up there, I'm still going to

09:05  22  be fair and impartial to everyone.  So...

09:05  23       (Laughter.)

09:05  24       MR. LANIER:  I will not tilt this toward the other wall of

09:05  25  guitars, so I will not try to take unfair advantage, Your

09:05  1    Honor.

09:05  2          THE COURT:  Okay.

09:05  3          MR. LANIER:  Mr. Sauer?

09:05  4          MR. SAUER:  Thank you.  Good morning, Your Honor.  Joe

09:05  5    Sauer for Google.

09:05  6          Jason, if we could put the slides up and start with Slide

09:05  7    2, that would be great.

09:05  8          Your Honor, I'm going to be really brief with this term.

09:05  9    And unless Your Honor has -- would like a refresher on the '825

09:05 10    patent or has any questions on the technology here, I can jump

09:05 11    right to the claim construction.

09:05 12          THE COURT:  No.  You can jump.  But let me tell you, at

09:05 13    least on this one, you start off with a little bit of a

09:05 14    hurdle -- or actually a pretty good hurdle.

09:05 15          One of the things that we do in the office, for better or

09:05 16    worse, is when I see a claim term like this one that looks to

09:06 17    me like it's probably pretty well-known in the industry, I'll

09:06 18    Google it just to see if -- you know, I sit there and say, wow.

09:06 19    Continuous wave Doppler radar.

09:06 20          My guess is that's something when the inventor was

09:06 21    drafting this patent that doesn't seem very contentious.  And I

09:06 22    looked it up, and there are about 1,000 hits, as it were, on

09:06 23    Google with this.

09:06 24          So on these I will tell you unless you can show me some

09:06 25    reason that there's something in the patent that requires me to

09:06  1  say that it emits an uninterrupted electromagnetic signal,

09:06  2  you're going to have a tough time with other than plain and

09:06  3  ordinary meaning.

09:06  4      And let me also start off because I've done this a lot

09:07  5  lately.  Occasionally what happens -- not occasionally.  Often

09:07  6  what happens is what you are about to tell me is that, Judge,

09:07  7  we know that continuous-wave Doppler radar really does have a

09:07  8  plain and ordinary meaning, but what we're worried about is we

09:07  9  have the plaintiff's infringement contentions.  And we can tell

09:07  10  from what they're doing that they're not using the plain and

09:07  11  ordinary meaning.  So you've got to construe it the way we say

09:07  12  because they're not following plain and ordinary meaning, and

09:07  13  we want to take care of that now.

09:07  14      And I will tell you, if it saves us time on the other

09:07  15  claim terms, in my opinion, claim construction on something

09:07  16  that's plain and ordinary meaning is not the time to be

09:07  17  prophylactic about what you all are doing.

09:07  18      If down the road -- I'll pick on the plaintiff for a

09:07  19  second.  If down the road the plaintiff submits to Google its

09:08  20  infringement -- I'm sorry -- its expert report on infringement

09:08  21  and at that time you can persuade me that when the expert says

09:08  22  that the product infringes they are not using the plain and

09:08  23  ordinary meaning, I'll seriously take it up.

09:08  24      I'll point out to everyone that in the recent trial I had

09:08  25  in Intel, originally that was a three-patent case.  And it was

7

09:08  1  a two-patent case at trial because I granted a motion for

09:08  2  summary judgment of noninfringement.

09:08  3       In my court I take motions for summary judgment and

09:08  4  Daubert motions and motions in limine very seriously.  And in

09:08  5  my -- that's where I -- I believe these kind of battles need to

09:08  6  be waged once I actually know what the plaintiff is going to

09:08  7  say in their expert report on infringement and you're going to

09:08  8  say in your reports on invalidity.

09:08  9       So if you have something that you need to add with this

09:09  10  one -- and I'm sorry for this long lecture, but this is true

09:09  11  with, you know, a number of these claim terms, as I look down

09:09  12  at them, "tap direction," "broadcast," the "input image."

09:09  13       These seem to me to be plain and ordinary meaning and not

09:09  14  needing to be construed in the manner that defendant wants,

09:09  15  absent some very good arguments we didn't see in the briefing

09:09  16  as to why the claim terms should be constrained in the manner

09:09  17  that you all have suggested.

09:09  18       So I know I've put a burden on you, but I feel like

09:09  19  transparency in what I'm thinking is better for you and your

09:09  20  clients than have you talk about some stuff that I may or may

09:09  21  not care about and not get right to the issues that I do.

09:10  22       I think we've had over 100 Markmans now.  I figure it's

09:10  23  best to let you all know exactly what is important to me and

09:10  24  what is not.  So after that long speech, which I apologize for,

09:10  25  I'm happy to hear any arguments that you want to make.

09:10   1        MR. SAUER:  Thank you, Your Honor.

09:10   2        In view of that helpful advice and Your Honor's advice to

09:10   3   focus on -- today on fine-tuning your preliminary

09:10   4   constructions, we're going to go ahead and jump right to

09:10   5   Slide 10.

09:10   6        THE COURT:  Okay.

09:10   7        MR. SAUER:  And we're not going to continue to argue our

09:10   8   original construction in view of Your Honor's advice this

09:10   9   morning.

09:10   10       THE COURT:  And let me -- I'm sorry.  Let me interrupt you

09:10   11  one more time.

09:10   12       And I want to make the record very clear to protect your

09:10   13  client.  I allow you all to maintain the constructions that you

09:10   14  proffered.  I understand that you are objecting to me giving

09:10   15  plain and ordinary meaning.  I encourage you all to try and, as

09:10   16  you said and I say often, fine-tune.

09:11   17       But I want to make the record clear that your original

09:11   18  proposed construction is what you believe is correct, and

09:11   19  you're only -- we're only doing this in light of your efforts

09:11   20  to try and help me come up with a claim construction.

09:11   21       But I want the record to be clear that as far as I'm

09:11   22  concerned, your client's rights are protected with respect to

09:11   23  the claim terms that you all proposed.

09:11   24       So, again, I've interrupted you like four times now.  I

09:11   25  try not to do that, but hopefully it will make the record

09:11  1    better for both sides.

09:11  2         MR. SAUER:  That's fine.  Thank you, Your Honor.

09:11  3         We do agree with our original construction, but in view of

09:11  4    your preliminary construction, I want to get right to just a

09:11  5    small suggestion to clarify the plain and ordinary meaning

09:11  6    based on aspects that we think that both parties are in

09:11  7    complete agreement here, Your Honor.  And that's a continuous

09:11  8    wave Doppler radar is not pulsed.

09:12  9         And I've highlighted on the slide for you this morning,

09:12  10   Your Honor, the plaintiff's claim construction briefing.

09:12  11   Plaintiffs repeatedly acknowledged in its briefs, Your Honor,

09:12  12   that the '825 patent discloses two types of Doppler radar,

09:12  13   continuous and pulsed, but that the claims only recite

09:12  14   continuous wave.

09:12  15        And we're in full agreement with this, Your Honor.

09:12  16        So similar to what Your Honor did recently in the Markman

09:12  17   orders in the Microsoft cases, we just suggest a minor

09:12  18   modification to the tentative construction just for clarity,

09:12  19   making the construction plain and ordinary meaning, wherein the

09:12  20   plain and ordinary meaning is not pulsed.

09:12  21        And with that said, Your Honor, that's all we have to say

09:12  22   on this claim this morning.

09:12  23        THE COURT:  Mr. Mangrum, I'll pick on you, but I know it

09:12  24   might be you or Mr. Huang or possibly someone else, but I'll

09:12  25   start with you.

09:12 1      MR. MANGRUM:  Good morning, Your Honor.  This is Brett

09:12 2 Mangrum.

09:12 3      I believe for this term one of my colleagues will be

09:13 4 addressing this particular term.

09:13 5      MR. KOIDE:  Your Honor, this is Mr. Koide.  I'll be

09:13 6 addressing this term.

09:13 7      THE COURT:  Good morning.  Welcome back.

09:13 8      MR. KOIDE:  Good morning, Your Honor.  Thank you.

09:13 9      THE COURT:  I think it's been almost two days since we've

09:13 10 been together.

09:13 11      MR. KOIDE:  Exactly.  Right, Your Honor.  I feel like it's

09:13 12 Ground Hog Day a little bit.  I'm sure you do as well.

09:13 13      So we don't want to belabor this point.  We largely agree

09:13 14 with what Your Honor was saying in -- I think Your Honor stole

09:13 15 the thunder of most of our points in that this is a

09:13 16 well-recognized term of art.

09:13 17      We cited to both a Wikipedia article and also a training

09:13 18 manual that shows that continuous-wave Doppler radar is a

09:13 19 recognized category.  And we're entitled to that full scope of

09:13 20 that category.

09:13 21      The concern we have that has been addressed in our briefs,

09:13 22 and I don't want to regurgitate it here, but it seems that

09:13 23 Google is trying to carve out a well-recognized subcategory of

09:14 24 continuous-wave Doppler radar called a frequency modulated one

09:14 25 where the frequency is varied.  And they seem to be kind of

09:14   1   getting a back end to it.

09:14   2        So I don't exactly know where they're going.  But the

09:14   3   point -- we just largely agree with Your Honor.  It's a

09:14   4   well-recognized term.  A POSITA would recognize what it is.

09:14   5   There's no reason to then kind of clarify and say something

09:14   6   it's not when it's a well-recognized term.  A POSITA would

09:14   7   understand what this means, and we should get the full scope of

09:14   8   that.

09:14   9        And that's basically our argument, Your Honor.

09:14  10        THE COURT:  Any response from defense?

09:14  11        MR. SAUER:  Just quickly, Your Honor.  Not to take too

09:14  12   much time on this term this morning.

09:14  13        THE COURT:  Let me -- this is as far as I go if I will,

09:14  14   say, chastise someone.  I'm pretty certain for everyone -- I'm

09:14  15   pretty certain I've lost more time in my life on the bench by

09:14  16   people saying "very quickly, Your Honor.  I won't take much of

09:14  17   your time."

09:14  18        (Laughter.)

09:14  19        THE COURT:  I think somewhere if I were on ESPN I could

09:15  20   actually give you a statistic of how much time I've lost.

09:15  21        You all have done -- I enjoy these hearings very much.  I

09:15  22   don't put time limits on them.  We have a whole day for this,

09:15  23   and I don't think we'll have to take it because of the claim

09:15  24   terms.  You all have as much time as you'd like to take to

09:15  25   argue these things.

09:15  1       And I enjoy these hearings very much.  So...

09:15  2       MR. SAUER:  Well, thank you, Your Honor.  And I will try

09:15  3  to be really short here because at bottom we are okay with

09:15  4  plain and ordinary meaning.

09:15  5       We do believe, though, that the plain and ordinary meaning

09:15  6  differentiates continuous wave from pulse.  The patent's clear

09:15  7  about that.  The prosecution history's very clear about that.

09:15  8  That was the distinction that was made during prosecution to

09:15  9  overcome the prior art.

09:15  10      We're not trying to play games here, Your Honor.  We'd

09:15  11  just like to clarify this now because we anticipate that it

09:15  12  could become a dispute down the road.  But if at the end of the

09:15  13  day Your Honor decides on plain and ordinary meaning, we can

09:15  14  live with that.

09:16  15      THE COURT:  Well, here's what I'm going to do on this one,

09:16  16  this specific claim term.  I understand the argument you all

09:16  17  are having.

09:16  18      I'm going to maintain plain and ordinary meaning, but

09:16  19  you -- both sides will have a couple of off-ramps.  If when you

09:16  20  get the expert report from the plaintiff, if you believe that

09:16  21  the plaintiff's expert has taken a position that includes, for

09:16  22  lack of a better word, "pulse," and you think -- to -- if you

09:16  23  believe that -- whether he says pulse or not, but he says your

09:16  24  product infringes, and by doing that he is saying that it

09:16  25  includes pulse that -- which you believe it should not, you can

09:16  1  come to the Court and ask for a mini-Markman hearing so I can

09:16  2  clarify and tell you all whether or not I'm okay with that.

09:16  3      Or you can file a motion for summary judgment and say that

09:16  4  that is not the plain and ordinary meaning.

09:16  5      And I know -- I know that plaintiff's counsel has heard me

09:17  6  give this lecture because they're kind of frequent flyers in

09:17  7  some ways and they get to -- they appear in front of me a lot.

09:17  8  But I just say the parties should not be too greedy in what

09:17  9  they do on the infringement side or invalidity side with their

09:17 10  expert reports because if we get -- if you get to that point

09:17 11  where it's a motion for summary judgment, you're not going to

09:17 12  have -- be able to fix your report.

09:17 13      So I'm -- plaintiff's counsel has heard your position this

09:17 14  morning.  They know that I'm aware of what your position is.

09:17 15  When they do their infringement analysis, they'll decide what's

09:17 16  best for their clients and do whatever they think is the

09:17 17  appropriate thing to do, and I will take it up.  And we will --

09:17 18  we will take it up if you raise it and you think there's

09:17 19  something inappropriate -- inappropriate's the wrong word, but

09:17 20  incorrect, we will take it up before trial.

09:17 21      MR. SAUER:  That's more than fair, Your Honor.  Thank you.

09:17 22      THE COURT:  The next claim term is -- and so folks know

09:18 23  who have not been on this call before, especially the clients,

09:18 24  because of Zoom, I wind up having three or four different

09:18 25  devices going at one time.

09:18  1        So if I look like I'm not paying attention to you all when

09:18  2   you're speaking, I'm going to one of my devices to figure out

09:18  3   what's -- what I'm looking at and also communicating with my

09:18  4   clerks.  So I am paying attention.

09:18  5        The next claim term is "tap direction."  And again the

09:18  6   Court has provided plain and ordinary meaning.  I'm not sure if

09:18  7   you're going to continue to argue.  But if you are, I welcome

09:18  8   to hear what you want to say.

09:18  9        MR. LANIER:  Your Honor, it's Greg Lanier again.  Jen Kash

09:18  10  of the Warren Lex firm will address this point.

09:18  11       Before Ms. Kash starts, just one quick point.

09:18  12       We really do appreciate Your Honor's clear direction and

09:18  13  transparency.  It will inform the rest of the argument on a

09:18  14  couple of these terms and in general, but I just wanted to

09:18  15  express our collective appreciation for that, so...

09:19  16       Ms. Kash?

09:19  17       THE COURT:  Well, maybe you should call some of the law

09:19  18  professors who are complaining about my lack of transparency

09:19  19  and tell them that your Yelp review is much, much better than

09:19  20  what I'm doing than theirs is.

09:19  21       At any rate, that was a joke.  If any of the law

09:19  22  professors are listening, that was just a joke.

09:19  23       Ms. Kash?

09:19  24       MS. KASH:  Good morning, Your Honor.  Good to see you

09:19  25  again.

09:19    1        THE COURT:  Good to see you again.

09:19    2        MS. KASH:  You've already taken what was going to be a

09:19    3    very short argument to even shorter by your words.

09:19    4        One thing that is of concern to us is, unlike waiting for

09:19    5    a dispute on tap direction until the infringement contention --

09:19    6    infringement stage, we actually have the dispute somewhat in

09:19    7    the briefs that were submitted by the plaintiff in terms of the

09:19    8    ordinary meaning.

09:19    9        We agree with you that if you Google "tap," it means

09:19   10    something very specific.  And so what we're trying to get an

09:19   11    understanding of is if the plain and ordinary meaning here is

09:19   12    that tap means tap.

09:19   13        And in the plaintiff's reply brief, they specifically

09:20   14    state that they think that our read of the tap being a lift-up

09:20   15    in some location and, therefore, limiting tap direction to

09:20   16    being the direction between taps in our construction that we

09:20   17    sought, they say that's an error.

09:20   18        And so we think this entire issue can and should be fairly

09:20   19    straightforward if tap is to mean tap, but we didn't -- we need

09:20   20    some guidance from the Court if that's its understanding as

09:20   21    well.

09:20   22        THE COURT:  I'm not sure who's going to speak on behalf of

09:20   23    plaintiff.

09:20   24        MR. KOIDE:  Your Honor, this is Mr. Koide again.  I'm

09:20   25    speaking for this term as well.

16

09:20  1        THE COURT:  Yes, sir.

09:20  2        MR. KOIDE:  Okay.  Again, I don't want to -- our main

09:20  3   point here is that it's a term that should be given its plain

09:20  4   and ordinary meaning to a POSITA, and so we agree with Your

09:20  5   Honor.

09:20  6        And I don't want to regurgitate the phrase, but the main

09:20  7   difference in the view of the specification's discussion of tap

09:20  8   is that Google views this discussion where it talks about

09:20  9   pointing, tapping and dragging all as mutually exclusive.

09:21  10       As we explained in our brief, they overlap.  For instance,

09:21  11  you could, you know, tap on a screen and then drag, or point on

09:21  12  a screen and then drag.  So they weren't meant to be these

09:21  13  three mutually exclusive categories.

09:21  14       And just, you know, even though the plain lay meaning of

09:21  15  tap is not necessarily the controlling, just to show it as an

09:21  16  analogy.  This could be a tap, okay?  This is what Google's

09:21  17  saying, a tap, lift, tap, lift.  It's also if I tap someone on

09:21  18  the shoulder and go like this and keep it there, that's a tap

09:21  19  too.

09:21  20       So that's the main difference we have is that they're

09:21  21  trying to unduly limit it to a particular preferred embodiment,

09:21  22  and we think we're entitled to the broader context of tap

09:21  23  direction.

09:21  24       THE COURT:  Well, let me suggest this on this one.  Again,

09:21  25  I understand this is important stuff.

09:21  1      Why don't we do this?  I don't know exactly when, but

09:21  2  there will be a time in the very near future when the plaintiff

09:22  3  will have to provide its infringement contentions that's --

09:22  4  it's set out in the schedule, but I'm not sure exactly when it

09:22  5  is.

09:22  6      If when the -- if when the plaintiff gives the defendant

09:22  7  its infringement contentions, if the defendant believes I need

09:22  8  to review and make sure that the position being taken by the

09:22  9  plaintiff on tap is consistent with plain and ordinary meaning,

09:22  10  I'll be happy to do that.

09:22  11      I will say, though, at this point that from what I read,

09:22  12  I'm in the -- for lack of a better word, I think tap is

09:22  13  something that ought to be given its full meaning, and I think

09:22  14  the plaintiff's position is perfectly reasonable in terms of it

09:22  15  being within the plain and ordinary meaning.

09:22  16      But we'll know more when you get the infringement

09:23  17  contentions, and you can contact the Court, and we can do a

09:23  18  quick hearing in that regard.

09:23  19      But I think tap direction, as far as I'm concerned, I

09:23  20  think you will -- I think Google should anticipate that it'll

09:23  21  be a fairly broad construction in plain and ordinary meaning of

09:23  22  what tap means.

09:23  23      And so let's move to the next claim term, which is

09:23  24  "communication traffic" and goes on.  Again, the Court has

09:23  25  given plain and ordinary meaning.

18

09:23  1          Who will be speaking on behalf of the defendant?

09:23  2          Ms. Kash, I'll start with you, or Mr. Lanier or whoever.

09:23  3          MR. LANIER:  Thank you, Your Honor.  My colleague, Michael

09:23  4   Lavine, and Tracy Stitt, my other colleague, may also be

09:23  5   lurking about that.  But Mr. Lavine will take point on this

09:23  6   issue.  Thank you.

09:23  7          THE COURT:  Okay.

09:23  8          MR. LAVINE:  Good morning, Your Honor.  Mike Lavine for

09:23  9   Google.

09:23  10         THE COURT:  Mr. Lavine, I don't think I've had you in

09:23  11  front of me before, at least not by -- in an appearance.

09:24  12  Welcome to my Court.  I appreciate you attending.

09:24  13         MR. LAVINE:  Thank you.  Glad to be here.

09:24  14         If you could bring up the slides.

09:24  15         All right.  Let's switch to Slide 4.

09:24  16         So, Your Honor, in view of the Court's preliminary

09:24  17  construction and to narrow the issues related to the term,

09:24  18  Google is proposing that an alternative construction that

09:24  19  focuses only on the access communication link portion of this

09:24  20  term.  So as you can see here --

09:24  21         THE COURT:  Can you give me just one -- let me read it

09:24  22  real quick, and then I'll -- I can't read and listen at the

09:24  23  same time.  Let me read what you've done real quick, and then

09:24  24  I'll get you started in just one second.

09:25  25         MR. LAVINE:  Sure.

09:25  1        THE COURT:  Mr. Lavine, thank you very much.

09:25  2        MR. LAVINE:  All right.  Let's turn to Slide 5.

09:25  3        So here I want -- I'd like to explain to the Court why

09:25  4   Google's construction should be adopted.

09:25  5        So the core of the dispute here is must the access

09:25  6   communication link connect to the communication network

09:25  7   subscriber?

09:25  8        Now, the plaintiff is saying no.  They're arguing that

09:25  9   it's not necessarily connected to a subscriber, but this is

09:25 10   inconsistent with what the claims and the specification

09:25 11   actually say.

09:25 12        There are really two fundamental aspects of this

09:25 13   invention, which are repeatedly stated by the patent.  The

09:26 14   first one is to monitor all of the communication networks

09:26 15   subscriber traffic over the access communication link and to

09:26 16   provide electronic content to the subscriber over that same

09:26 17   link through the access network.

09:26 18        However, you can't -- all the traffic can't be monitored

09:26 19   and the electronic content cannot be provided to the subscriber

09:26 20   unless that access communication link is in -- at a point in

09:26 21   the network where it can connect the subscriber to the actual

09:26 22   network.

09:26 23        And this point is set forth in the claim language itself,

09:26 24   which you see here on the right.  The communication traffic

09:26 25   exchanged with the subscriber is monitored as it travels across

09:26  1   the access communication link.  That same link enables the

09:26  2   subscriber to access the electronic content.  That link is in

09:26  3   an access network which contains the content source that

09:26  4   delivers content to the subscriber over that link.

09:26  5        And if you turn to Slide 6, we can see more of the key

09:27  6   evidence in the specification that underscores Google's

09:27  7   position.

09:27  8        Looking at Figure 2 at the top part of the slide, this is

09:27  9   a magnification of a portion of Figure 2 from the patent.  And

09:27  10  you see highlighted in blue, there's an Item 26.  That is the

09:27  11  access communication link, and it is the only place that a

09:27  12  patent identifies as a location for the access communication

09:27  13  link.

09:27  14       The specification also repeatedly and consistently places

09:27  15  that link, that access communication link directly between the

09:27  16  subscriber and the access network.

09:27  17       In particular, if you look at Column -- on the bottom left

09:27  18  to Column 7, Lines 61 to 67, it reads here that the

09:27  19  "interactions between the subscriber and the electronic content

09:27  20  source are enabled by the access communication link through the

09:27  21  access network."

09:27  22       And further down in that call-out it reads that "all of

09:27  23  the online traffic that is exchanged with the subscriber

09:27  24  traverses the access communication link."

09:28  25       So there's no doubt that there's -- there has to be a

09:28  1   connection between the communication network subscriber and the

09:28  2   access network.

09:28  3        And finally --

09:28  4        THE COURT:  Mr. Lavine?

09:28  5        MR. LAVINE:  Yes.

09:28  6        THE COURT:  If I could have you -- I'm going to let you

09:28  7   finish and say whatever you want, but if we could flip to

09:28  8   whoever's going to speak for the plaintiff.  And I'll let

09:28  9   you -- plaintiff do whatever they want once it's your turn, but

09:28  10  if you could address real quickly while we have this slide up

09:28  11  what's shown on Column 5 (sic), at Lines 36 to 38, and respond

09:28  12  to where it says, "In a typical ISP scenario, all of the online

09:28  13  traffic that is exchanged with the subscriber 22 traverses the

09:28  14  access communication to link 26."

09:28  15       And then, Mr. Lavine, I'll let you respond back, if I

09:28  16  could hear from plaintiff.

09:29  17       I'm not sure who just responded for plaintiff, but at

09:29  18  least I can't hear them.

09:29  19       Mr. Lanier, can you hear me?

09:29  20       MR. LANIER:  Yes, Your Honor.  I can hear Your Honor and

09:29  21  Mr. Lavine.  I could not hear anyone for plaintiff.

09:29  22       THE COURT:  Well, then let's do this.  Let's go ahead and

09:30  23  have Mr. Lavine finish.  And maybe we can -- and if y'all can

09:30  24  remember when you come back to that slide, I'd like to hear on

09:30  25  that.

09:30    1        But let's let -- Mr. Lavine, if you'd finish, and I'll

09:30    2   hear from the plaintiff and hopefully we'll get back on audio.

09:30    3        MR. LAVINE:  Yes, Your Honor.

09:30    4        Let's turn to Slide 7.

09:30    5        So one of the plaintiff's arguments is that Google's

09:30    6   construction precludes having the access communication link in

09:30    7   the access network, but that argument really is not supported

09:30    8   by the specification.

09:30    9        And here we focus again on Figure 2, which is magnified to

09:30   10   show that connection between the subscriber and the access

09:30   11   network.  You can see that the access communication link

09:30   12   clearly is between the subscriber and the access network.  But

09:30   13   it's also part of it that is inside the access network itself.

09:30   14        So the link can exist both between and in the access

09:30   15   network.  But even if the Court takes issue with the word

09:30   16   "between" for describing the link, we can use the word

09:30   17   "connected" instead.  So the construction of "access

09:31   18   communication link" becomes a network link connecting the

09:31   19   communication network subscriber and the access network.

09:31   20        But regardless of whether you use "between" or

09:31   21   "connecting," the key takeaway is that based on the claims in

09:31   22   the specification, the access communication link must connect

09:31   23   the subscriber and the access network.

09:31   24        So that's all we have on this term, Your Honor.

09:31   25        THE COURT:  Thank you, Mr. Lavine.  Well done.

09:31  1       Is -- for the plaintiff?

09:31  2       MR. MANGRUM:  Your Honor, this is Brett Mangrum for the

09:31  3  plaintiff.  If we can put that slide back up, and I apologize

09:31  4  for not speaking earlier.  We had a disconnect on our side with

09:31  5  respect to who would be addressing.

09:31  6       So keeping in mind that we were just informed that this

09:31  7  would be one of the terms that they wanted to address, I think

09:31  8  the -- the salient point from the quotation that Your Honor

09:31  9  raised is that the phrasing itself in that disclosure says

09:31  10  "typically."  And that's a signal that's used by patent

09:32  11  practitioners to make clear that what follows is exemplary

09:32  12  disclosure.

09:32  13       And when you have things such as "typically" or "for

09:32  14  example" or "in some embodiments" or "in certain embodiments"

09:32  15  or "in this embodiment," these are ways in which patent

09:32  16  drafters signal to the reader that what follows is exemplary.

09:32  17  It pertains to a specific example and is not meant to be read

09:32  18  in as a claim limitation.

09:32  19       Now, that type of phraseology within patent drafting is

09:32  20  often juxtaposed by the courts in instances where a patentee

09:32  21  makes very clear that a certain description that follows is

09:32  22  intended to be limiting.

09:32  23       And oftentimes that appears in languages such as "must,"

09:32  24  "the present invention must."  And quite often it's simply

09:33  25  expressed in the claim language itself.

09:33  1      So our concern, and we've seen this throughout the

09:33  2  briefing Google's offered, is that in many instances you have

09:33  3  this explanatory language, to an example "embodiment" signaled

09:33  4  by languages such as "typically" or "for example."  And Google

09:33  5  has then read in that exemplary disclosure as a claim

09:33  6  limitation.

09:33  7      And in our briefing in every instance that's happened,

09:33  8  we've attempted to draw Your Honor's attention to the Phillips

09:33  9  counsel against reading in claim limitations -- sorry --

09:33  10  importing claim limitations from the specification into a claim

09:33  11  term as a cardinal sin.

09:33  12      We've also pointed Your Honor to case law that says this

09:33  13  is improper to do even in those instances -- which is not the

09:33  14  case here -- where only a single embodiment is disclosed.

09:34  15      So, again, we would submit that in asking us to focus on

09:34  16  this particular statement, the word "typically" actually

09:34  17  undercuts Google's position and favors plain and ordinary

09:34  18  meaning that's not so limiting.

09:34  19      (Clarification by the reporter.)

09:34  20      THE COURT:  Mr. Lavine?

09:34  21      MR. LAVINE:  Yes, Your Honor.  I think the focus on the

09:34  22  word "typical" really doesn't address the issue here.

09:34  23      Like I said, the main point is -- of this invention, of

09:34  24  this patent is to monitor all of the subscriber's communication

09:34  25  traffic.

09:34  1      If you adopt the plaintiff's position, that really

09:34  2  detaches the subscriber from the rest of the network in a way

09:34  3  that doesn't make sense.  Because without that link between the

09:34  4  subscriber and the access network, you can't monitor that

09:35  5  traffic, and you can't provide them the content.

09:35  6      And the whole point of this patent is to use that traffic,

09:35  7  monitor that traffic and create a profile that is used to

09:35  8  provide targeted content to the subscriber.  That link is

09:35  9  essential, and it must under all circumstances exist between

09:35  10  the subscriber and the access network.

09:35  11      THE COURT:  Any response?

09:35  12      MR. MANGRUM:  Yes, Your Honor.  Brett Mangrum for patent

09:35  13  owner.

09:35  14      Again, the purpose of claim construction is to not provide

09:35  15  within a -- an interpretation of a specific claim term -- an

09:35  16  explanation of how the invention is supposed to operate.

09:35  17      Nor is it an opportunity to suggest that in the absence of

09:35  18  some type of additional instruction or interpretation or

09:35  19  limitation, the claims would not operate as intended.

09:35  20      Those questions of interoperability go to not claim

09:35  21  construction but another statutory requirement.  And we would

09:36  22  submit that we've heard nothing today nor in the briefing that

09:36  23  would compel -- and, again, the standard -- sorry -- would

09:36  24  compel the limitations they're seeking to require.

09:36  25      And the standard here when you're attempting to read in

09:36  1    "exemplary disclosure" as a claim limitation is that the

09:36  2    intrinsic evidence must -- and I'm quoting here --

09:36  3    "unambiguously require" the limitations being sought.

09:36  4         What we just heard is, well, don't pay attention to the

09:36  5    word "typically" and look at the rest of the disclosure.

09:36  6         But you have to.  You have to consider what the patentee

09:36  7    said because in this instance words matter.  And they signal an

09:36  8    intent to give an explanatory description of something that's

09:36  9    not limiting but simply a fulsome description of how things

09:36  10   would operate according to a particular embodiment.

09:36  11        It is very important.  The standard's clear.  And the

09:36  12   attempt to import something just to make a claim -- allegedly

09:37  13   make a claim inoperable under the term -- under an argument

09:37  14   offered by an attorney and not by an expert, we think doesn't

09:37  15   meet the exacting standard here to import a limitation.

09:37  16        THE COURT:  The Court is going to maintain its preliminary

09:37  17   construction of plain and ordinary meaning.

09:37  18        Given what I've said earlier and what we've discussed, is

09:37  19   there any need -- I'll ask counsel for the defendant.  Is there

09:37  20   any need to take up "broadcast" and "broadcasting"?

09:37  21        MR. LANIER:  Your Honor, Ms. Stitt will address that

09:37  22   extremely briefly in view of Your Honor's guidance.

09:37  23        (Laughter.)

09:37  24        THE COURT:  Okay.

09:37  25        MR. LANIER:  Thank you.

09:37   1        MS. STITT:  Good morning, Your Honor.  Tracy Stitt

09:37   2   representing Google.  Pleasure to be here, and I will cut

09:37   3   straight to the point.

09:37   4        So, Jason, if you could please put up Slide 3.

09:38   5        With Your Honor's previous guidance, we understand the

09:38   6   position.  And the sole purpose for raising this term was to

09:38   7   request a clarification of the plain and ordinary meaning, and

09:38   8   that is to resolve what we feel is an issue and dispute based

09:38   9   on a statement in the plaintiff's brief.  And that is whether

09:38   10  "broadcasting" means transmission to all receivers in the

09:38   11  network.

09:38   12       In their brief plaintiffs indicated that it does not

09:38   13  necessarily require transmission to all receivers in a network.

09:38   14  The claim language and the specification as we've cited we

09:38   15  believe does require that.  And so for that reason we request

09:38   16  the clarification that the plain and ordinary meaning, which is

09:38   17  "transmission to all receivers in a network."

09:38   18       THE COURT:  Well, I know what you would like.  I don't

09:38   19  think this is -- based on their briefing, I really don't think,

09:38   20  though, until the plaintiff's expert has taken a position with

09:38   21  respect to what infringement is or is not, that -- I don't

09:39   22  think this -- I think broadcasting means broadcasting.

09:39   23       And I know that the plaintiff -- you've each done your

09:39   24  briefing, but I think it's just plain and ordinary meaning.

09:39   25  And, again, it's something that, you know, we'll take up down

09:39  1    the road if necessary.

09:39  2        And let me add one more thing, though, that I also think

09:39  3    on a claim term like "broadcasting," I don't think that -- this

09:39  4    is my opinion.  The Circuit may tell me ultimately I'm wrong.

09:39  5    I don't think that you get to -- and I'm not saying you said

09:39  6    the words "O2 Micro," but I don't think you get to create an

09:39  7    O2 Micro situation by taking a word that's -- like

09:39  8    "broadcasting" and having a difference of opinion.

09:39  9        It may very well be in this case that if the parties take

09:39  10   different positions with respect to what the plain and ordinary

09:39  11   meaning of "broadcasting" is, I may very well decide that

09:39  12   that's an issue that a jury can take up as well.

09:40  13       But I'm going to maintain plain and ordinary meaning for

09:40  14   "broadcasting."

09:40  15       Let me see what the next claim term is.

09:40  16       It is "the input image," and, again, it appears that

09:40  17   Google would like to take this and have me insert the words

09:40  18   "the original input image."

09:40  19       But I will allow Google's counsel to tell me why it is

09:40  20   that I should take a claim term like "the input image" and give

09:40  21   it anything other than its plain and ordinary meaning.

09:40  22       MR. LANIER:  Your Honor, Matt Warren of the Warren Lex

09:40  23   firm will address this term and the other terms in the '491

09:40  24   patent.

09:40  25       THE COURT:  Okay.  Mr. Warren, I don't think I've had you

09:40   1   appear in front of me either, at least not by person -- by

09:40   2   video.  I welcome you to my court.

09:41   3        MR. WARREN:  Good morning, Your Honor.  And thank you.

09:41   4   This is my first appearance before Your Honor, and I'm honored

09:41   5   to be here.

09:41   6        Jason, if you could put up the slide.

09:41   7        Your Honor, in light of the Court's tentative, we're not

09:41   8   going to contest at this time.  Obviously, we'll reserve our

09:41   9   rights.

09:41   10       The original construction -- I do want to ask one

09:41   11  clarification about the plain and ordinary meaning.

09:41   12       And, Jason, if you could go one slide forward.

09:41   13       Our understanding of the plain and ordinary meaning of an

09:41   14  input image, whatever else it includes, is that every instance

09:41   15  of "the input image," using the normal patent rules of

09:41   16  antecedent basis, refers back to "an input image" at the

09:41   17  beginning of the claim.

09:41   18       The plaintiff has stated in its claim construction

09:41   19  briefing that it does not agree.

09:41   20       And, Jason, could you advance one?

09:41   21       And has indicated that two of these indications of "the

09:41   22  input image" means something other than what we would consider

09:42   23  to be the clear antecedent basis, "an input image."

09:42   24       And so we would appreciate clarification from the Court as

09:42   25  to whether the plain and ordinary meaning of "the input image"

30

09:42  1  allows for that word to mean different things over the course

09:42  2  of the claim or, as we believe, whether it refers back

09:42  3  consistently to "an input image," the antecedent basis.

09:42  4      THE COURT:  I'll hear a response from the plaintiff.

09:42  5      MR. MANGRUM:  Your Honor, this is Brett Mangrum for the

09:42  6  plaintiff.

09:42  7      My father, who is a law professor who's never commented on

09:42  8  your court, he once taught when you strike oil, quit drilling.

09:42  9  And I think that's kind of where we are here.

09:42  10     But out of the sake of completeness, if you look at -- and

09:42  11  what I'm going to do is actually pull up the claim and then

09:42  12  share my screen.  Do that real quick.

09:43  13     Okay.  So what I've done here, I actually pulled this up

09:43  14  from the Google app, and I've highlighted "the input image."

09:43  15     Just to confirm, Your Honor, are you able to see the full

09:43  16  Claim 1 clearly so that I can address it?  On your screen.

09:43  17     THE COURT:  I get down to -- I see all the way down to

09:43  18  where it says "perform" -- let me see if I can move you folks.

09:43  19     I can now.  Yes.

09:43  20     MR. MANGRUM:  Okay.  Good.

09:43  21     Okay.  So our point here was that as you go through

09:44  22  Claim 1, you see at the outset -- and I'm at the -- sorry.  I'm

09:44  23  at the first clause, the processing clause.  The processing is

09:44  24  defined in terms of a correct -- performing a correction on the

09:44  25  input image.

09:44  1      Now, that's important because the correction on the input

09:44  2  image is later referenced as either being successful or

09:44  3  unsuccessful.  So here -- let me give you an example.

09:44  4      In response to the processing of the input image being

09:44  5  unsuccessful.  Now, keep in mind the processing must include a

09:44  6  correction on the input image.

09:44  7      So in certain clauses there are method steps performed on

09:44  8  the condition of the processing being unsuccessful.  In other

09:44  9  clauses there's processing being conditioned in response to the

09:45  10 processing of the input image being successful.

09:45  11     So in the instances where it's successful, necessarily

09:45  12 there must have been a correction on the input image, right?

09:45  13 That's obviously not necessary in the case for unsuccessful.

09:45  14     What we heard today from Google's counsel was that -- a

09:45  15 concern that the input image is not necessarily the same in all

09:45  16 instances under the process flow set forth in Claim 1.

09:45  17     Well, that should not be a concern because there are

09:45  18 conditional statements that are mutually exclusive.  In one

09:45  19 instance, something being in response to the input image being

09:45  20 unsuccessful; in another instance, something being responsive

09:45  21 to the processing of the input image being successful, which,

09:45  22 again, would necessarily require performing a correction on the

09:45  23 input image.

09:45  24     So in asking for the plain and ordinary meaning, we're not

09:46  25 departing from this antecedent reference of "the" inserted

09:46  1    before "input image."  Rather, we are recognizing that the

09:46  2    claim language itself provides sufficient context.

09:46  3        And to suggest that "the input image" always refers to "an

09:46  4    input image" that had no correction performed thereon is just

09:46  5    simply inconsistent with the plain reading of the claim

09:46  6    language.

09:46  7        And to be clear, Your Honor, I think we've addressed all

09:46  8    of this in our briefing.  I'm just attempting to summarize the

09:46  9    more salient points in view of what was argued today.

09:46  10       And with that, I'll stop sharing my screen.

09:46  11       THE COURT:  Okay.  Any response from Google?

09:46  12       MR. WARREN:  So I timed that, Your Honor.  That was just

09:46  13   over three and a half minutes to explain the plaintiff's

09:46  14   meaning of the term.

09:46  15       I don't know what it is, but it's not plain and ordinary.

09:47  16       Our understanding, which is plain and ordinary, is that

09:47  17   the word "an input image" sets -- you know, references an

09:47  18   image.  That's the plain and ordinary meaning of the words

09:47  19   "and" and "image."

09:47  20       And, furthermore, using the normal rules of patent

09:47  21   construction, later references to "the input image" refer back

09:47  22   to the same image.  I don't know how to summarize it more

09:47  23   quickly than that.  I think that's pretty quickly.  And I think

09:47  24   that plaintiff's sort of convoluted explanation of the

09:47  25   rationale for their understanding of the term explains why that

09:47   1   is not the plain and ordinary meaning.

09:47   2       THE COURT:  Anything else from plaintiff?

09:47   3       MR. MANGRUM:  No, Your Honor.

09:47   4       We have no ad hominem attack or any other explanation

09:47   5   other than what we've given or what's in our briefing.

09:47   6       THE COURT:  I'll be back in a few seconds.

09:47   7       (Pause in proceedings.)

09:48   8       THE COURT:  Okay.  The Court does not believe that it

09:48   9   needs to give any additional construction to this.  It will

09:48   10  maintain plain and ordinary meaning.

09:48   11      The next up we are moving -- let's see.  We're moving to

09:49   12  "said processor configured to provide..." and it goes on.  And

09:49   13  these are ones that my understanding is the plaintiff has asked

09:49   14  the Court to hear.

09:49   15      And so I'll start with plaintiff's counsel, whoever's

09:49   16  going to speak on behalf of plaintiff.

09:49   17      MR. MANGRUM:  Your Honor, this is Brett --

09:49   18      THE COURT:  Hannah tells me -- just told me I skipped

09:49   19  some, and I may have, given -- whoops.  Did I skip -- I skipped

09:49   20  "computer program product."  I apologize.

09:49   21      Let me do "computer program product," and then we have one

09:49   22  more for defendant, and then I'll turn to plaintiff.  So I

09:49   23  apologize for that.

09:49   24      MR. WARREN:  Thank you, Your Honor.  And no problem.

09:49   25      The -- there are two terms left, Claim 25 of the '491

09:49  1    patent and Claim 13 of the '491 patent.  For these terms, there

09:49  2    are two issues:  One, whether or not means-plus-function

09:50  3    treatment applies and then, two, the Court's determination

09:50  4    regarding the function and structure.

09:50  5        We are arguing at this point only the first issue.  And so

09:50  6    we are not arguing at this point the Court's function and

09:50  7    structure determinations.

09:50  8        I would like to speak on whether or not these terms should

09:50  9    receive means-plus-function treatment.  And I'd like to start,

09:50  10   if that's okay with Your Honor, with Claim 25, "apparatus

09:50  11   comprising a processor and memory including computer program

09:50  12   code."

09:50  13       And if that's all right, Jason, can you put up their

09:50  14   Slide 6 regarding disputed processor terms?

09:50  15       This is a slide that we received this morning.  It's

09:50  16   regarding a different patent.  It's regarding a different

09:50  17   patent, and I'm sure they'll talk about it when we get to that

09:50  18   patent.

09:50  19       But they set forth three factors used in determining

09:51  20   whether processor itself connotes sufficient structure and is

09:51  21   not a nonce term.

09:51  22       I don't totally agree with their standard, but for the

09:51  23   purposes of this argument, we can accept their standard because

09:51  24   I think we win even under their standard.

09:51  25       The first thing that they say is whether a party seeking

09:51   1   means-plus-function construction has pointed to a record that

09:51   2   establishes that processors is generic.  We have done that.

09:51   3         If you look at Column 9 of the '491 patent, starting at

09:51   4   Line 31, it says, "For example, the processing element 72 may

09:51   5   be embodied as a processor, a coprocessor, a controller or

09:51   6   various other processing means or devices, including integrated

09:51   7   circuits such as, for example, an ASIC."

09:51   8         I don't know how to be more generic than that.  They

09:51   9   essentially say the processor can be anything.

09:51   10         Point No. 2 is whether the claims in the specification

09:52   11   provide specific connection and interaction of the claim

09:52   12   processor with other structural components.  Again, they do

09:52   13   not.  There is simply a box that says:  This box is a

09:52   14   processor.

09:52   15         And then, Jason, if you could turn to the next slide.

09:52   16         Category 3, whether the claims and specification describe

09:52   17   how the data processor accomplishes the claimed functions.

09:52   18   Again, they do not.  And the plaintiff has not explained how

09:52   19   they do.

09:52   20         So for this reason -- and then I will now cite to the

09:52   21   highest and best authority, which is Your Honor's ruling

09:52   22   elsewhere in this case on Claim 1 of the '825 patent, which is

09:52   23   not being contested further by the plaintiff, at least at this

09:52   24   hearing, which has strikingly similar language.

09:52   25         Claim 1 of the '825 patent is "at least one memory and the

09:52  1   computer program code are configured, with the at least one

09:53  2   processor to cause the apparatus to at least..."

09:53  3        That is almost exactly the same as the language in

09:53  4   Claim 25 of the '491 patent, which simply says "apparatus

09:53  5   comprising a processor and memory including computer program

09:53  6   code, the memory and the computer program code configured to,

09:53  7   with the processor, cause the apparatus at least to..."

09:53  8        We believe that Your Honor's tentative was correct with

09:53  9   regard to Claim 1 of the '825.  And in light of the standard

09:53  10  set forth by the plaintiff and its application to Claim 25 of

09:53  11  the '491, we believe that Claim 25 of the '491 should also

09:53  12  receive means-plus-function status, which would mean that since

09:53  13  we are not contesting those at this time, Your Honor's

09:53  14  tentative function and structure with regard to Claim 41 would

09:53  15  apply to Claim 25 as well.

09:53  16       Thank you.

09:53  17       THE COURT:  Thank you, sir.

09:54  18       A response?

09:54  19       MR. MANGRUM:  Yes.  If I could have the screen back.

09:54  20       Thank you.

09:54  21       This is Brett Mangrum speaking on behalf of plaintiff.

09:54  22       So a couple of points.  One, it's interesting they cite to

09:54  23  authority we address in our briefs concerning instances where

09:54  24  terms recite means.  Here that's not the case.

09:54  25       So as Your Honor is aware, one of the points we raised in

09:54 1 our briefing that's very important here is that Claim 25 is an

09:54 2 apparatus claim that has -- the body of Claim 25 is very

09:54 3 similar in limitations to the body of Claim 41.  Really the

09:54 4 only meaningful difference is that Claim 41 is written in

09:54 5 means-plus-function form.  Both are directed to an apparatus.

09:54 6     So if you come to a conclusion that Claim 25 invokes

09:55 7 means-plus-function and the parties have agreed that Claim 41

09:55 8 does so, what you have is two independent claims that have

09:55 9 literally no difference in scope.

09:55 10     And that gives rise to a presumption, and it's a strong

09:55 11 presumption in this instance, under the Doctrine of Claim

09:55 12 Differentiation that when the patentee used "means for" for one

09:55 13 independent claim in reciting certain limitations and did not

09:55 14 use "means for" in another apparatus claim in reciting

09:55 15 virtually identical limitations, that the distinction was

09:55 16 intentional.

09:55 17     And under the Doctrine of Claim Differentiation, those

09:55 18 terms must be given -- or sorry -- those independent claims

09:55 19 must be given different scope and meaning.

09:55 20     That was our primary argument.  We cited to Al-Site for

09:56 21 that proposition.  That's a Federal Circuit case.  And we

09:56 22 believe that it's -- as an extension of the Doctrine of Claim

09:56 23 Differentiation, that's important.

09:56 24     There's also a secondary presumption that we have to

09:56 25 overcome that, again, wasn't part of those cases that they

09:56  1    cited from our slide deck, which is that the lack of the words

09:56  2    "means" in Claims 13 and 25 gives rise to a rebuttable

09:56  3    presumption that the terms don't invoke means-plus-function.

09:56  4         In the absence of Claim 41, this might have been a closer

09:56  5    call.  But Claim 41 really is the nail in the coffin for their

09:56  6    construction because it leaves no doubt that if you want to

09:56  7    have Claim 25 and Claim 41 have difference in meaning and

09:56  8    scope, you must conclude that Claim 25, the apparatus claim,

09:56  9    does not invoke means-plus-function construction when Claim 41

09:57  10   does.

09:57  11        And this is further compounded by Claim 13, which also in

09:57  12   its body has limitations that match up line for line almost

09:57  13   with Claims 25 and 41.

09:57  14        The difference between Claims 13 and 25 is that, one,

09:57  15   Claim 13 is directed to a computer program product and then

09:57  16   the -- which is, as we explained in our briefing, more of the

09:57  17   Beauregard form of claim drafting, whereas Claim 25 is directed

09:57  18   to an apparatus.

09:57  19        But beyond that, the limitations are largely identical.

09:57  20   So, again, we submit the presumptions that weren't even

09:57  21   referenced in opposing counsel remarks and were hardly rebutted

09:57  22   in the briefing, those presumptions are significant here, and

09:57  23   they stand unrebutted.

09:57  24        THE COURT:  A response?

09:57  25        MR. WARREN:  Sure, Your Honor.

09:57  1      I'm a little puzzled by counsel's argument, which

09:58  2  primarily said that the slides that we put up about the

09:58  3  disputed processor terms concerned a term where the word

09:58  4  "means" appears.  That's simply not correct.

09:58  5      If you look at Page 9 of the Court's claim construction,

09:58  6  tentative, or it's Page 9 of mine, I'm not sure if it's the

09:58  7  same.  That term is "said processor configured to provide," and

09:58  8  there's a dispute there about whether or not that's subject to

09:58  9  means-plus-function.  The word "means" does not appear there at

09:58  10  all.  So we are -- we're in the same place in terms of the

09:58  11  presumption in that case -- or on that term as we are here.

09:58  12      Counsel also made an argument regarding claim

09:58  13  differentiation.  The Al-Site case, if you look at their brief

09:58  14  on Page 7 of their reply brief, they actually don't cite the

09:58  15  Al-Site brief for this.  They cite the Matthews Patent Digest

09:58  16  interpretation of the Al-Site case.

09:58  17      I don't agree with that interpretation.  I don't think

09:58  18  it's correct.  But it doesn't matter because I have much higher

09:59  19  authority, which is Your Honor's findings again, elsewhere in

09:59  20  these very cases again, uncontested by plaintiff during this

09:59  21  hearing, specifically with regard to Claim 16 of the '563

09:59  22  patent, and that is in the 581 case.

09:59  23      And in that case Your Honor found that an alerting unit

09:59  24  configured to issue an alert was subject to 112(6) despite the

09:59  25  fact that there was an equivalent "means for" claim.

—40

```
09:59   1        And I agree with Your Honor that claim differentiation

09:59   2   does not require a "means for" claim to eliminate

09:59   3   means-plus-function treatment.  They are subject to the --

09:59   4   other claims are subject to the regular Williamson analysis,

09:59   5   and there is obviously a different presumption.  And we

09:59   6   acknowledge that, and we believe we've overcome that.

09:59   7        But the existence of one claim that says "means for" is

10:00   8   not a "get out of means-plus-function treatment free card" for

10:00   9   every other claim in the same patent.  There's no case that

10:00  10   says that it is.  It wouldn't make sense that it is.  Even the

10:00  11   Al-Site case that they quote applied the regular Williamson

10:00  12   analysis, which is required by the Federal Circuit.

10:00  13        We think we win under that analysis, and we think the

10:00  14   Court properly applied that in the 581 case despite the

10:00  15   existence of a "means for" claim elsewhere in the same patent.

10:00  16        Thank you, Your Honor.

10:00  17        THE COURT:  Anything else from plaintiff?

10:00  18        MR. MANGRUM:  Yeah.  Just the final point would be, one

10:00  19   thing we didn't address today, but it's clear in our briefing,

10:00  20   is that the structure of -- and a difference in what's recited

10:00  21   in Claim 25 and Claim 24 arises in part from the preamble

10:00  22   itself.

10:00  23        And we pointed to authority where in reciting Beauregard

10:01  24   forms of claim drafting, the computable readable storage medium

10:01  25   having computer readable program code portions stored therein,
```

41

10:01  1  that form of claim drafting has been recognized by the courts

10:01  2  consistently as referring to sufficiently definite structure,

10:01  3  and then the body of the claim then goes to operations that the

10:01  4  software performs.

10:01  5       To suggest that that form of claim drafting invokes

10:01  6  means-plus-function construction, that's against the Beauregard

10:01  7  claim drafting practice that's been recognized for quite some

10:01  8  time now.

10:01  9       And, again, for 5 -- Claim 5, I think it's important --

10:01  10  and you haven't heard any argument today or in Google's

10:01  11  briefing -- that Claims 5 and 40 -- sorry.  I said Claim 5.  I

10:01  12  meant Claim 25.

10:01  13       Claim 25 and 41 are both directed to an apparatus.  You

10:02  14  haven't heard any distinction from opposing counsel today as to

10:02  15  meaning and scope if the Court were to interpret Claim 25 and

10:02  16  Claim 41 as both being means-plus-function construction.  They

10:02  17  haven't disputed the fact that that would then render Claim 25

10:02  18  completely superfluous with Claim 41.

10:02  19       And that's why, again, that -- the presumption here is not

10:02  20  just a presumption.  It's an especially strong presumption when

10:02  21  you would subsume one claim into another.

10:02  22       And we submit that because of that, because of the

10:02  23  circumstances unique to this case, and because of the -- the

10:02  24  lack of the word "means" creates a separate presumption, that

10:02  25  these presumptions applicable here -- and not always applicable

10:02   1   in the authority that we cited to because in certain instances

10:02   2   the terms at issue were "means for" terms, that in view of

10:02   3   that, the -- these applicable presumptions have now been

10:02   4   rebutted and the preliminary construction should stand.

10:03   5          THE COURT:  Anything else for Google?

10:03   6          MR. WARREN:  Only if Your Honor has questions.

10:03   7          THE COURT:  Okay.  Thank you.  I'll be back in a few

10:03   8   seconds.

10:03   9          (Pause in proceedings.)

10:06  10          THE COURT:  If we can go back on the record.

10:06  11          The Court is going to maintain its plain and ordinary

10:06  12   meaning construction.

10:06  13          And the last term to be taken up by Google, I think, is

10:06  14   "apparatus comprising a processor and memory..." and goes on

10:06  15   from there.

10:06  16          Counsel?

10:06  17          MR. WARREN:  Your Honor, that was the one -- Claim 25 was

10:06  18   the one that we just argued.

10:06  19          THE COURT:  Okay.  Good.

10:06  20          MR. WARREN:  In light of Your Honor's decision, I will

10:06  21   reserve on Claim 13, "computer program product comprising."

10:06  22          THE COURT:  Okay.  Thank you.  Then we'll move to the

10:06  23   plaintiff's terms.

10:06  24          MR. MANGRUM:  Your Honor, this is Brett Mangrum.  And I'll

10:06  25   be presenting for the remainder of plaintiff's terms.

43

10:07  1      We submitted slides this morning pursuant to the Court's

10:07  2  instructions, both to the court reporter and to opposing

10:07  3  counsel.  I want to make certain that you can see that now as

10:07  4  the portion of the screen that I'm sharing.

10:07  5      THE COURT:  I can.

10:07  6      MR. MANGRUM:  Okay.  Great.

10:07  7      So, again, this is Brett Mangrum for plaintiff speaking,

10:07  8  and I'm now looking at Slide 1.  I'm going to expand this to

10:07  9  make certain that the slide numbering can be shown.

10:07  10      And for these terms here we are dealing with a situation

10:07  11  where there were not "means for" terms recited in either the

10:08  12  '045 patent or the '585 patent.

10:08  13      So what I'm showing on Slide 2 is the claim language in

10:08  14  question in two separate patents of two separate cases.  I will

10:08  15  first address Claim 1 of the '045 patent, which is asserted in

10:08  16  the 574 case.  I will then address Claim 9 of the '585 patent

10:08  17  in the 577 case.

10:08  18      And to be clear, one thing that distinguishes these, and

10:08  19  we concede this and recognize this, is that in these cases they

10:08  20  were not separate "means for" claims that had the exact same --

10:08  21  otherwise had the exact same scope.  So that especially strong

10:08  22  presumption that I referenced earlier does not apply here.

10:08  23      And for that reason, in addressing these particular terms,

10:08  24  we cited to Optis -- actually, I think it was in response to

10:08  25  the defendant citing to Optis, but we refer to those same cases

10:09   1   as providing a helpful analysis to determine whether or not

10:09   2   "processor configured to" in particular, that particular phrase

10:09   3   invokes 112(6) or not.

10:09   4        And the slides that opposing counsel showed went to a

10:09   5   discussion of what -- what do you look at in the intrinsic

10:09   6   evidence that would be helpful in understanding whether or not

10:09   7   processor is just a black box with no real meaning, just an

10:09   8   ethereal element, or instead, whether a processor is, as that

10:09   9   term is typically used in the art and connotes definite

10:09   10  structure.  And the courts look at how that term is used in the

10:09   11  intrinsic evidence to make that decision.

10:09   12       And so if I could just touch again on the two points

10:09   13  that -- I was going to skip this, but since they brought it up,

10:10   14  I want to make sure that it's clear.

10:10   15       So in the Optis case one of the factors that the Court

10:10   16  considered was whether or not the party seeking a

10:10   17  means-plus-function construction, in this case the defendant,

10:10   18  has "pointed to an intrinsic record that establishes that

10:10   19  'processors' is meant here to generically be anything that

10:10   20  manipulates data as opposed to connoting structure representing

10:10   21  what is generally known as a processor."

10:10   22       There was a second important point that's also relevant

10:10   23  here raised in Optis, and that was whether -- and I'm quoting

10:10   24  again -- "the claims and specification provide specific

10:10   25  connection and interaction of the claim processor" -- and that

| | | |
|---|---|---|
| 10:10 | 1 | is in brackets -- "with other structural components." |
| 10:10 | 2 | There was a third point that was relevant in another case |
| 10:11 | 3 | that I believe, again -- well, we certainly cited to it, but I |
| 10:11 | 4 | think it was in response to defendants citing to this case, an |
| 10:11 | 5 | Eastern District of Texas case, St. Isidore Research. |
| 10:11 | 6 | And the quote there is whether "the claims and |
| 10:11 | 7 | specification describe how the data processor accomplishes the |
| 10:11 | 8 | claimed functions." |
| 10:11 | 9 | Now, in view of this instruction we felt was helpful, we |
| 10:11 | 10 | looked then in our briefing at the intrinsic evidence and |
| 10:11 | 11 | showed instances where the intrinsic evidence supported an |
| 10:11 | 12 | understanding that here in this particular -- so I'm referring |
| 10:11 | 13 | to the first case, Claim 1 of the '045 patent, 574 case, said |
| 10:11 | 14 | "processor configured to provide a preemptive user output when |
| 10:11 | 15 | the subset of pixels approaches an edge of the set of available |
| 10:11 | 16 | pixels." |
| 10:11 | 17 | We endeavored to show in our briefing instances where the |
| 10:12 | 18 | intrinsic evidence matches up with those types of factors that |
| 10:12 | 19 | would support an understanding consistent with the lack of the |
| 10:12 | 20 | word "means" that processor connotes sufficiently definite |
| 10:12 | 21 | structure to avoid application of Paragraph -- of Section |
| 10:12 | 22 | 112(6). |
| 10:12 | 23 | Now, here are -- here's where the river meets the road. |
| 10:12 | 24 | Here's intrinsic evidence with reference to Processor 4. |
| 10:12 | 25 | That is the element that we identified in the event that |

46

10:12  1    the Court says that this term invokes 112(6), that is the

10:12  2    structure.

10:12  3         But what does the specification say about the processor?

10:12  4    And keep in mind, the word "processor" itself is recited in the

10:12  5    claim as corresponding structure.

10:12  6         So this Figure 15A of Slide 8 and a corresponding example

10:12  7    description of Figure 15A are particularly important.  Now,

10:12  8    what we see in Figure 15A is a Box 80 of processing circuitry

10:13  9    and Box 82 of memory, both of those being indicated by these --

10:13 10    general reference 4 which is Processor 4.

10:13 11         And this is what the corresponding description states.

10:13 12    Referring to Figure 15A, "The Processor 4 may comprise

10:13 13    processing circuitry 80 that is configured to read from and

10:13 14    write to a memory 82.  The processing circuitry 80 may also

10:13 15    comprise an output interface via which data and/or commands are

10:13 16    output by the Processor 4 and an input interface via which data

10:13 17    and/or commands are input to the Processor 4."

10:13 18         So I'm reading here from Columns 13, Lines 16 to 21 of the

10:13 19    '045 patent.

10:13 20         So what we see here is that very explicit description of

10:13 21    the processor connoting sufficiently physical structure having

10:14 22    certain operations that are generally associated with a

10:14 23    physical processor as is known in the art.

10:14 24         Now, in response to pointing to this disclosure, all we

10:14 25    have from the defendant's side is attorney argument that that's

10:14 1   not enough.  Or that this disclosure would not be understood by

10:14 2   persons of ordinary skill in the art to describe "processor" as

10:14 3   that "processor" term is normally understood as a term that

10:14 4   connotes structure.

10:14 5       We don't have expert testimony from their side giving the

10:14 6   perspective of a POSITA or a person of ordinary skill in the

10:14 7   art as to how they would interpret this particular disclosure

10:14 8   referring to processing circuitry and memory and interaction

10:14 9   between those two all being encompassed within a processor.

10:14 10      But the specification goes on.  And after describing --

10:14 11  I'm sorry.  Even in earlier figures it discusses the Processor

10:15 12  4 in terms of its interoperation, interconnection with other

10:15 13  elements, physical components of the system.

10:15 14      So on Slide 9 what we've shown is on the left the '045

10:15 15  patent, Figure 1 with the processor in communication with the

10:15 16  camera sensor 10.

10:15 17      And then on Figure 3 you have a Processor 4, which here is

10:15 18  described as host processor in connection with a memory 26,

10:15 19  user input/output 6, and then also a camera sensor.

10:15 20      Now, there's a dotted line around the camera sensor here

10:15 21  because the corresponding description in the specification

10:15 22  refers to the camera sensor is being housed within a hardware

10:15 23  module 20.

10:15 24      So here you have the host Processor 4 showing an

10:15 25  interconnection with hardware, right?  A hardware module that's

48

10:15  1   housing a camera sensor.  Again, underscoring that from the

10:16  2   perspective of the patent, the word "processor" is used as it's

10:16  3   known in the art to connote sufficiently definite structure,

10:16  4   and it's a physical component.

10:16  5       We also pointed in our briefing to what I've shown here in

10:16  6   exploded form on Slide 10 from Columns 5 and 6, that the host

10:16  7   processor 24 and 28 may be a multifunctional processor such as,

10:16  8   for example, a central processing unit.

10:16  9       And then moving to Slide 11, this slide's important

10:16  10  because it identifies two aspects of the processor that are

10:16  11  significant in view of the claim language that's in dispute.

10:16  12      Now, Claim 1 recites the processor term in multiple

10:16  13  contexts.  In order to comply with the Court's order to narrow

10:16  14  the disputes, the defendant chose to pick this particular said

10:16  15  processor limitation.

10:16  16      We don't take issue with that.  I'm just bringing that up

10:17  17  to the Court that there are other instances where said

10:17  18  processor is recited.  This is the one they chose to address.

10:17  19      And in this particular instance, the functional language

10:17  20  they identified is described and attributed within the

10:17  21  specification to Processor 4, which is why we argued in the

10:17  22  alternative in the event the processor term as recited invokes

10:17  23  Paragraph 112(6) that the corresponding structure, as set forth

10:17  24  in the specification, would be Processor 4.

10:17  25      So what we've shown here on Slide 11 is a Figure 14 -- and

49

10:17  1   actually it's just a portion of Figure 14 -- that has two

10:17  2   operational steps, 120 and 122.

10:17  3       One, in the 120 is "detect subset of pixels approaching

10:17  4   edge of set of pixels."  And then in 122, "output preemptive

10:17  5   user output."

10:17  6       Now, in the corresponding description, both of these are

10:17  7   attributed to the processor, the same physical element that was

10:18  8   addressed in earlier slides and in our briefing.

10:18  9       So reading from Column 12, Lines 42 to 48, "then at block

10:18  10  120 the Processor 4 detects that the subset of pixels, 102, is

10:18  11  approaching an edge of the set of available pixels.  Next, at

10:18  12  block 122, the Processor 4 provides a preemptive user output

10:18  13  110."

10:18  14      And then it goes on to describe output 110.

10:18  15      Now, this is not all that the specification provides.  But

10:18  16  this is important because here there's an explicit tether in

10:18  17  the description between what the defendant has identified as

10:18  18  functional language for this term and Processor 4.

10:18  19      When you go on, there is -- there are other figures beyond

10:18  20  just the flowchart that describes the process of detecting and

10:18  21  outputting.

10:18  22      So here on Slide 12 you have excerpt from Column 10, Lines

10:19  23  17 to 25 where it talks about, "As this tracking process

10:19  24  continues, the subset of pixels approaches an edge 103 of the

10:19  25  set of available pixels.  This is illustrated in Figs. 8B, 9B

10:19   1    and 9C."  For the convenience of the Court, Figure 9B is also

10:19   2    shown on Slide 12.

10:19   3         The description goes on to say at Line 20 of Column 10,

10:19   4    "The Processor 4 is configured to detect when the subset of

10:19   5    pixels 102 approaches an edge (example, edge 103) of the set of

10:19   6    available pixels.  The Processor 4 is configured to provide, in

10:19   7    response to that detection, a preemptive user output that

10:19   8    facilitates or instigates user action."

10:19   9         Okay.  Now, but that's not it.  That's not all it's

10:19   10   providing.

10:19   11        So we clearly have a tethering within the specification of

10:20   12   Processor 4 to the functional description.  We clearly have

10:20   13   descriptions within the specification of the physical nature of

10:20   14   processor.

10:20   15        But in addition to all of that, in connection with the

10:20   16   dual-step process of detecting a subset of pixels and

10:20   17   outputting a preemptive user output, the specification goes on

10:20   18   to provide examples of how that is accomplished for both of

10:20   19   those steps.

10:20   20        And so what is shown in Slide 18 is an excerpt from Column

10:20   21   11, Lines 8 through 26, and I won't read it all into the

10:20   22   record, but the highlighted part is important.

10:20   23        Starting at Line 8 of Column 11, the specification states,

10:20   24   "The Processor 4 may be configured to detect the subset of

10:20   25   pixels 102 approaching an edge of the set of available pixels

10:20  1    100 in a number of different ways.  For example..."  And the

10:20  2    disclosure that continues provides an example of how this is

10:20  3    done for the detection.

10:21  4        But the specification doesn't stop there.  As shown in

10:21  5    Slide 14, there's a further description of the output and it

10:21  6    provides an example.  Slide 13 -- I'm sorry -- Slide 14

10:21  7    includes a screenshot of Figure 13 from the '045 patent.  And

10:21  8    on the left it includes an excerpt of Column 11, 27 to 42 of

10:21  9    the '045 patent.

10:21  10       And here, this is important because you have a description

10:21  11   of how user output 110 may be preemptively provided according

10:21  12   to an example embodiment.  And if I would just for the sake of

10:21  13   completeness read into the record the first statement appearing

10:21  14   on Line 27.  "In Figure 8B a particular type of user output,

10:21  15   110, is provided preemptively to avoid loss of tracking when

10:21  16   the subset of pixels, 102, approaches an edge of the set of

10:21  17   available pixels, 100."

10:21  18       And then it says, "However, other forms of preemptive user

10:21  19   output, 110, may be provided."  Then it goes on to provide an

10:22  20   example of how this is accomplished with reference to Figure

10:22  21   13.

10:22  22       And so keeping in mind that these terms do not recite the

10:22  23   word "means," the processor configured to terms of the '045

10:22  24   patent that's recited in Claim 1 only.  They don't recite the

10:22  25   word "means."  So there's a presumption that we worked with at

10:22   1   the outset that the terms don't invoke means-plus-function.

10:22   2       We have to also keep in mind who has the burden of proof

10:22   3   here to show indefiniteness and that the burden of proof is by

10:22   4   clear and convincing evidence.

10:22   5       The theory advanced by defendant in this case for this

10:22   6   claim was that the specification discloses no corresponding

10:22   7   structure.

10:22   8       And keep in mind it's their burden to prove that that is

10:22   9   true by clear and convincing evidence.  The burden doesn't

10:22   10   shift at any point for this particular term in this discussion

10:22   11   to plaintiff.

10:22   12       Nevertheless, in the interest of showing that there are --

10:22   13   that Processor 4 does connote structure, that there's a

10:23   14   description, and that there's a description associated with the

10:23   15   functional language.  We identified in our brief where that is.

10:23   16   We've summarized it here.

10:23   17       We submit that in view of what the intrinsic evidence

10:23   18   shows, the very onerous burden of clear and convincing evidence

10:23   19   that there's no structure -- that's their theory -- is simply

10:23   20   not met.

10:23   21       I also want to emphasize that in the briefing that Google

10:23   22   provided there was no argument that algorithmic structure was

10:23   23   necessarily required.  There's no mention of Aristocrat or WMS

10:23   24   Gaming.  Nevertheless, there are algorithmic disclosure and

10:23   25   flowcharts shown, and we've emphasized that here.

53

10:23  1      But that was never an argument that they raised.  Their

10:23  2  argument -- in fact, they worded in the alternative.  In their

10:23  3  opening brief -- I'm sorry -- their responsive brief to

10:23  4  plaintiff's opening brief, defendants said something to the

10:23  5  effect of "there's no algorithm or structure and that's why

10:24  6  it's indefinite."

10:24  7      And so they appear to concede there that either one of

10:24  8  those would have been sufficient.  We submit that there's both,

10:24  9  but they never made the argument that there necessarily needs

10:24  10  to be an algorithm.

10:24  11      Had they done so, it still would have fallen flat because

10:24  12  as shown, there is an algorithm that involves, at a minimum,

10:24  13  detecting when you approach an edge and then, based off that

10:24  14  detection, an output.  And that there are explicit attributions

10:24  15  of that functional requirement for those operations, I should

10:24  16  say, as disclosed in the specification to the Processor 4.

10:24  17      And then, again, Processor 4 itself is described as having

10:24  18  corresponding electric circuitry on this having -- interfacing

10:24  19  with other structural components of the system.  And it's

10:24  20  recited in the context of the claims as interconnected and

10:24  21  interoperating with other components.

10:24  22      So in view of the case law that says, here's some factors

10:24  23  to consider when you're looking at "process configured to"

10:25  24  language to assess whether or not the term invokes

10:25  25  means-plus-function construction.

54

10:25  1        And keeping in mind for both presumptions, both for

10:25  2   raising an indefiniteness argument, it's clear and convincing

10:25  3   evidence, burden of proof.  And to rebut the presumption, it's

10:25  4   not the same burden.  We recognize that, but it's still a

10:25  5   burden for petitioner to rebut that -- we feel that they

10:25  6   haven't been rebutted here.  We feel that the perspective of a

10:25  7   person of ordinary skill in the art has not been established by

10:25  8   expert testimony for certain, and then all we have is an

10:25  9   argument from defendant that in view of all this evidence,

10:25  10  there is no structure.

10:25  11       And we simply submit that that's not a plausible

10:25  12  interpretation of the intrinsic evidence before the Court.

10:25  13       THE COURT:  A response from Google?

10:25  14       MR. LANIER:  Yes, Your Honor.  My colleague, Marlee

10:26  15  Hartenstein, will respond with respect to the '045 patent on

10:26  16  this issue.

10:26  17       MS. HARTENSTEIN:  Thank you, Your Honor.  This is Marlee

10:26  18  Hartenstein for Google.

10:26  19       Your Honor, we accept the Court's --

10:26  20       THE COURT:  Welcome to my Court.  I look forward to

10:26  21  hearing you.

10:26  22       MS. HARTENSTEIN:  Thank you very much.

10:26  23       Your Honor, we accept the Court's tentative construction

10:26  24  of this processor term.  The arguments that plaintiff just

10:26  25  presented today have all been addressed in our briefing and

10:26  1   were properly accounted for in Your Honor's tentative.

10:26  2        Unless Your Honor has any specific questions, I do just

10:26  3   have a quick couple of responsive points.

10:27  4        First, Your Honor, we heard a lot of argument about the

10:27  5   presumption against the client, Section 112(6), but the

10:27  6   presumption is just that.

10:27  7        And, Jason, if you could briefly put up Slide 18 for the

10:27  8   '045 patent.  Thank you.

10:27  9        Cases tell us, and we've explained in our brief, that the

10:27  10  presumption is not strong.  And in situations such as this

10:27  11  where a processor is defined by purely functional terms, you

10:27  12  can't avoid Section 112(6).

10:27  13       And, further, with respect to their contention that expert

10:27  14  testimony is required, the Federal Circuit has told us, and we

10:27  15  have said in our briefs, that that's not the case.  Expert

10:27  16  testimony is not necessary.  In fact, the Federal Circuit has

10:27  17  said that the intrinsic evidence is the most important.

10:27  18       And, lastly, Your Honor, with respect to their arguments

10:27  19  regarding corresponding structure, plaintiff has a few

10:27  20  problems.

10:27  21       As a threshold matter, this indefiniteness issue has been

10:28  22  front and center since January, but this is the first time that

10:28  23  they've attempted to identify any corresponding structure.  So

10:28  24  at a minimum, this issue is waived.  But even if not, their

10:28  25  argument still substantively fails.

56

10:28   1       This is a computer-implemented invention, Your Honor.  And

10:28   2   in that case, cases like Williamson has told us that simply

10:28   3   pointing to a general purpose computer or processor is not

10:28   4   enough.

10:28   5       What is necessary, what is absent here and what they still

10:28   6   haven't identified is an algorithm that performs the recited

10:28   7   function.

10:28   8       At most they show from the specification a simple

10:28   9   repetition of the functional language of the claim.  We can see

10:28   10  that perfectly on plaintiff's Slide 11.  Really, processor is

10:28   11  used as a placeholder here to describe a few functional

10:28   12  limitations of this claim.

10:28   13      And unless Your Honor has any other specific questions, we

10:28   14  accept the Court's tentative, and I'm happy to conclude and

10:28   15  pass the baton on to the next term.

10:28   16      THE COURT:  Okay.  I'll be back in a second.

10:29   17      (Pause in proceedings.)

10:29   18      MR. MANGRUM:  Your Honor, if I may address one important

10:29   19  point to correct the record?

10:29   20      THE COURT:  Sure.

10:29   21      MR. MANGRUM:  So to be very clear, we are not -- I agree

10:29   22  with what Ms. Hartenstein said at the outset, which is that we

10:29   23  have summarized here the points we raised in our briefing.

10:29   24  That's correct.  That's what we've presented today.

10:29   25      It's not correct, however, to suggest that we never stated

10:29  1    Processor 4 is the corresponding structure.  That's in our

10:29  2    brief.  And, in fact, it's reflected in the Court's

10:29  3    articulation of the parties' respective positions.

10:29  4        So that's something that we've all argued in our briefing.

10:29  5    The Court's recognized that's from our briefing.  We've argued

10:29  6    that in the alternative to an interpretation that this term

10:29  7    does not invoke 112(6).

10:29  8        So to suggest that's being sprung here for the first time

10:29  9    is a mischaracterization of the record.  However, one point I

10:30  10   want to make clear is when you look at their briefing, and I'm

10:30  11   happy to go to the --

10:30  12       THE COURT:  Let me interrupt you.  So --

10:30  13       MR. MANGRUM:  Yeah.

10:30  14       THE COURT:  And so I have to say that it's always good to

10:30  15   wake up in the morning and face someone with such passion over

10:30  16   a means -- a means-plus-function structure.  It's rare you get

10:30  17   this much excitement.

10:30  18       Help me with whether the Processor 4 is adequate

10:30  19   disclosure of a structure.  Does that make sense?

10:30  20       MR. MANGRUM:  Yeah.  Sorry.  Was that a question?  It

10:30  21   didn't come through.

10:30  22       THE COURT:  Yes, sir.  That was a question.

10:30  23       That was our debate as we were trying to figure out

10:30  24   whether the -- obviously, the preliminary construction was

10:30  25   whether it was -- there was an adequate disclosure of a

58

10:30  1    specific processor.  And help me with Figure 4 -- I'm sorry --

10:31  2    Processor 4 being an adequate structure in this case.

10:31  3        MR. MANGRUM:  Sure.  So that -- I think I understand your

10:31  4    question now.

10:31  5        And Processor 4, to be clear, we didn't just say processor

10:31  6    in general.  We were specific in identifying Processor 4 and

10:31  7    the corresponding description of Processor 4, and that's

10:31  8    important.

10:31  9        What we didn't do, but we'd be willing to do now if this

10:31  10   is -- if this is defendant's new argument, is to further

10:31  11   specify, as we argued from Slide 11 of our demonstratives, that

10:31  12   the Processor 4 would -- which is itself structure -- would

10:31  13   effectuate this functional language by executing Steps 120 and

10:32  14   122 of Figure 14.

10:32  15       Now, there's a reason why we didn't do that in our

10:32  16   briefing.  And the reason is we really kind of had to shoot in

10:32  17   the dark in our opening claim construction brief because we

10:32  18   hadn't had any specifics from Google as to their theory of

10:32  19   indefiniteness.  They didn't tell us whether or not they felt

10:32  20   the term necessarily required disclosure of an algorithm.

10:32  21       In their opening -- sorry -- in their response to our

10:32  22   opening brief, they still did not say this.  They didn't cite

10:32  23   Aristocrat.  They didn't cite WMS Gaming, and they never made

10:32  24   the argument "this term must disclose an algorithm or it is

10:32  25   indefinite."

10:32  1      And because they never raised that argument, we figured

10:32  2  the dispute was more accurately characterized as to whether or

10:32  3  not Processor 4 provides sufficiently definite structure.

10:32  4      For the first time today, we've now heard from them that

10:33  5  there must be a disclosure of an algorithm.  If that's their

10:33  6  position, then that doesn't support an indefiniteness argument.

10:33  7  One simply needs to look to where in the specification there's

10:33  8  a disclosure of algorithmic structure corresponding to the

10:33  9  functional language at issue.

10:33  10     And we submit there is.  It's what the Processor 4 does,

10:33  11 and it's expressly tethered in a two-step process to what is

10:33  12 required in the claim language in dispute.  And, again, it's

10:33  13 Processor 4 that does it.

10:33  14     So a Processor 4 operating Steps 120 and 122 of Figure 14

10:33  15 would be the structure.  This has been analogous structure

10:33  16 that's been identified in other cases where a processor has

10:33  17 been found to invoke 112(6).

10:33  18     And to suggest there's no algorithm, there's no structure,

10:34  19 that, we feel, is inconsistent with the intrinsic evidence and

10:34  20 not supported by anything other than a blind eye in briefing to

10:34  21 what is actually disclosed.

10:34  22     THE COURT:  Any response?

10:34  23     MS. HARTENSTEIN:  Yes, Your Honor.

10:34  24     The algorithm that the plaintiffs point to is that

10:34  25 flowchart on -- I believe it's Figure 14, but really all that

10:34  1   does is simply repeat the claim language.  That doesn't

10:34  2   disclose an algorithm.

10:34  3       If we look at the term "processor," it's really just a

10:34  4   catch-all that -- without noting sufficiently detailed

10:34  5   structure.  But even if processor did connote some level of

10:34  6   structure in and of itself, as we've explained in our brief,

10:34  7   that's not enough.

10:34  8       The Federal Circuit has told us that the question is not

10:34  9   if it connotes some level of structure.  It's whether they have

10:34  10  sufficient structure to perform the claim function.

10:35  11      THE COURT:  Response to that?

10:35  12      MR. MANGRUM:  Yeah.  I just -- I don't think that they're

10:35  13  articulating the correct standard, Your Honor.  I think the

10:35  14  processor is described as being physical.  It's described, as

10:35  15  we showed in Slide 8, as containing processing circuitry, and

10:35  16  on its own it incorporates some form of memory.  It's described

10:35  17  as being structurally interconnected with other components that

10:35  18  you didn't hear today or in Google's briefing that are somehow

10:35  19  ethereal.

10:35  20      There's been no dispute that the processor is described in

10:35  21  the spec as being connected to physical structure.  This is

10:35  22  also relevant to the analysis and factors courts have

10:35  23  considered.  That's not in dispute, right?

10:35  24      There hasn't been a dispute of how the claim language

10:35  25  itself interconnects, interoperates the processor with other

61

10:35  1  recited components.

10:35  2       So they haven't explained why in view of Figure 1,

10:35  3  Figure 3 and Figure 15A, that somehow the Processor 4 is

10:36  4  ethereal or a black box and has no corresponding description

10:36  5  where a person from ordinary skill in the art in view of what's

10:36  6  disclosed would recognize, oh, when they say "processor,"

10:36  7  that's what they mean.  They mean processor.

10:36  8       We pointed to evidence.  We pointed to what the

10:36  9  specification discloses.  There's been no rebuttal to the

10:36  10  evidence we pointed to other than to say, we don't think it's

10:36  11  enough.

10:36  12       And they seem to be articulating like a super standard

10:36  13  of -- I fear that other cases and other authorities that have

10:36  14  found processors' descriptions to -- even in instances where

10:36  15  the "processor" term invokes 112(6), that no claim would

10:36  16  survive.

10:36  17       What else is needed other than a physical description of

10:36  18  processor, algorithmic disclosure corresponding to the function

10:36  19  in question and an explicit tether of the "processor" term

10:36  20  itself to that functional language?

10:36  21       If this doesn't suffice to -- under a clear and convincing

10:37  22  indefiniteness standard, I would fear that they're flipping the

10:37  23  standard on its head and putting the onus on patent -- on the

10:37  24  patentee to disprove an indefiniteness theory.

10:37  25       That's not the standard.  That's not the law.  And we

| | |
|---|---|
| 10:37 | 1 |

think the burden rests with them.  It's a high burden, and it
has not been met.

    THE COURT:  Anything else?

    MS. HARTENSTEIN:  Well, Your Honor, just quickly.

    They seem to argue that there's some categorical rule that
we're trying to propose about whether processor would invoke
Section 112(6).

    There's not, nor would I propose one today.  It's really a
case-by-case evaluation:  Analyzing the claim language, other
intrinsic evidence, applying the principles of Williamson and
its progeny, like this Court has done in its tentative
construction.

    The rest of what Mr. Mangrum has said, I do believe our
briefs have addressed those points.  Thank you.

    THE COURT:  I rarely do this, but I will -- I'm -- you all
have been -- done a good job of not confusing, but I think that
both sides make compeling arguments.

    You will -- we will get -- I'll have my clerks let you
know in the next day or so what we're going to do with this
claim term.

    And so let's move on to the next one.  Give me one second.

    Okay.  Yeah.  I mean, we've spent -- probably of all the
claim terms, that was the one we spent the most time trying to
get right.  So it was -- we thought it was a difficult one.  So
give me one second.

63

```
10:38   1        The next claim term to take up is "client management
10:38   2   processor configured."  And, again, for the same reason as the
10:38   3   last one, this one is one that will be started with
10:39   4   Mr. Mangrum.
10:39   5        (Clarification by the reporter.)
10:39   6        MR. MANGRUM:  What would we do without that helpful
10:39   7   prompting?  Thank you.  And thank you also for your e-mail and
10:39   8   reminding me to do that before the hearing even started.
10:39   9        So Brett Mangrum for plaintiff.  And I am sharing my
10:39   10  slides, the same slide deck.  Here we're starting at Slide 16.
10:39   11  And for the sake of efficiency, we intend to address the
10:39   12  "processor" terms of Claim 9 collectively.
10:39   13       They're all recited in the same claim.  We're calling them
10:39   14  the "processor" terms in that they are all -- all three terms
10:39   15  recite "processor configured to."  However, they're recited in
10:40   16  unique context in the sense that there's qualifying terms
10:40   17  preceding each "processor configured to."
10:40   18       And we've -- as you can see here on Slide 16, like for
10:40   19  Term No. 3 -- and these are the numberings the parties used for
10:40   20  briefing purposes -- the "client manager" -- "management
10:40   21  processor" is the first term, a "detection processor" is the
10:40   22  second term, and then a "collaborative application management
10:40   23  processor" is the third term.
10:40   24       Now, as set forth in our briefing, those qualifying terms
10:40   25  are important in the sense that it helps because the concept of
```

10:40   1   processors that are specifically dedicated to certain purposes

10:40   2   is disclosed in the '585 patent.  The patent uses qualifying

10:40   3   terms to be able to differentiate between processors.

10:40   4        So, again, in each instance, a processor's not referring

10:41   5   to all -- just a black box processor in general.  Rather, these

10:41   6   claim nomenclature, this qualifying language is intended to

10:41   7   invoke the -- or simply reflect the corresponding description

10:41   8   in the specification.

10:41   9        So when you see "client management processor," that's what

10:41   10   you should look for in the specification, something that's

10:41   11   referred to as client management or detection or collaborative

10:41   12   application, et cetera.

10:41   13        And what we did then in our analysis, following the same

10:41   14   instructive authority of the cases we cited, including Optis

10:41   15   and others, is look at the intrinsic evidence and see what the

10:41   16   specification states with respect to those processor terms, how

10:41   17   they're described.  And then in view of that explain why the

10:41   18   defendant has not met its burden to show that there is -- and

10:41   19   their theory, again, is that there's no structure.

10:41   20        And here, again, there wasn't an argument in the briefing

10:42   21   at least that there's a lack of structure because there must be

10:42   22   algorithmic structure.

10:42   23        The briefing simply focuses on the argument that there is

10:42   24   no structure, algorithm or otherwise.  There's just nothing in

10:42   25   the specification that could be attributed to a structure.

10:42  1    And keep in mind in this instance, in interpreting how the

10:42  2    specification would be understood from a person of ordinary

10:42  3    skill in the art, all that the defendant offers is attorney

10:42  4    argument.

10:42  5    And our position is not that you must in all instances

10:42  6    have expert testimony to support a conclusion of indefiniteness

10:42  7    when you're considering whether the terms invoke

10:42  8    means-plus-function, whether or not there's sufficient

10:42  9    structure disclosed.  That's not our position.

10:42  10   But our position is this:  The dispute here is unique in

10:42  11   that you're asking whether or not the intrinsic evidence --

10:42  12   there could -- whether or not the intrinsic evidence discloses

10:43  13   what a person of ordinary skill in the art would understand to

10:43  14   be reasonably certain structure.

10:43  15   And to have that perspective and to be able to interpret

10:43  16   what is disclosed and what's tethered to these functional

10:43  17   requirements and suggest, "ignore this disclosure or this is

10:43  18   not enough, this disclosure's not enough or this one's not

10:43  19   enough," based off of attorney argument is problematic for

10:43  20   defendants in view of the standard of clear and convincing

10:43  21   evidence.

10:43  22   That's the point we raised is that under the particular

10:43  23   circumstances of this case where they are attempting to

10:43  24   interpret what is disclosed in the specification and saying

10:43  25   either, A, it's not tethered or, B, it's not structured, or

10:43  1    it's not what someone skilled in the art would understand to be

10:43  2    definite structure, that's an attorney argument based off a

10:43  3    factual interpretation that's within the purview of expert

10:44  4    report.  That's one of the problems they have.

10:44  5        So I've -- moving on to Slide 18.  I've reemphasized this

10:44  6    point from Optis that I'm highlighting now on the slide,

10:44  7    whether the claims and specification provide specific

10:44  8    connection and interaction of the claimed processor with other

10:44  9    structural components.

10:44  10        And so we address this in our briefing with respect to

10:44  11   examples.  And I haven't summarized here everything that's in

10:44  12   our briefing, but it's important to recognize that Claim 9

10:44  13   expressly recites the client management processor term as, one,

10:44  14   structurally tied to an electronic message client.

10:44  15        And there's been no dispute as to -- at least in that --

10:44  16   as recited in the claim that that's structure.

10:44  17        And, two, enabling the user to select an electronic

10:44  18   message from the inbox where the plurality of electronic

10:44  19   messages are qualified as being stored in a message storage

10:44  20   database, that database also being a structural component.  We

10:45  21   have no expert testimony to confirm otherwise.

10:45  22        Claim 9 also with respect to the detection processor term

10:45  23   recites that term in an interactive context with other

10:45  24   structural components of the term.  And this is expressed, for

10:45  25   example, in the requirement that it must be configured to

10:45  1  detect the action defined in the archiving rule assigned to the

10:45  2  selected electronic message was carried out.

10:45  3       And our point raised in the briefing was the detection

10:45  4  processor logically cannot detect the action was carried out --

10:45  5  that's a requirement recited -- unless the detection processor

10:45  6  is structurally tied to at least the portion of the

10:45  7  communication system carrying out that action.

10:45  8       Logically, one flows from the other.  How do you make a

10:45  9  detection, a real-world detection in the absence of having some

10:45  10  type of interrelationship with other real-world components?

10:46  11       So, again, this is relevant to the Optis analysis when you

10:46  12  look at claim language and look at interactions with other

10:46  13  structural components.

10:46  14       Referring now specifically to the first of the three

10:46  15  terms, the '585 patent specification expressly ties certain

10:46  16  exemplary structure to the alleged functional language for

10:46  17  client management processor.

10:46  18       What we've done in Slide 17 is highlight the e-mail

10:46  19  client, right?  It resides at a specific location within the

10:46  20  system.  It houses messages.  It's described structurally as

10:46  21  having certain algorithm structure and features.  And this --

10:46  22  with respect to Figure 1, it sits at the top left-hand side of

10:46  23  the figure.

10:46  24       The '585 patent expressly ties certain exemplary structure

10:46  25  to the alleged functional language for the client management

10:46  1  processor, as shown in Slide 18 at Column 4, Lines 8 through

10:46  2  23.

10:46  3      I won't read this into the record, but it's clear that

10:47  4  there's a description of the electronic message client to

10:47  5  enabling the user, among other things, to select a message from

10:47  6  the inbox to be transferred.  That's one of the functional

10:47  7  requirements according to defendant's interpretation of

10:47  8  means-plus-function construction.

10:47  9      But then it says more precisely and goes on to explain how

10:47 10  this can be effected according to the example embodiment.  You

10:47 11  don't have a black box that merely reflects the claim language

10:47 12  but rather exemplary disclosure directed to how this could be

10:47 13  effected.

10:47 14      Now, obviously for the purposes of slide presentation,

10:47 15  it's difficult to put the entire disclosure relevant to the

10:47 16  client management processor within a slide.

10:47 17      Our point here is simply to state that it's not our burden

10:47 18  to defend the definiteness of a claim that the Patent Office

10:47 19  issued.  It's defendant's burden to prove their theory that

10:47 20  there is no structural disclosure.

10:47 21      And that's plainly false when you have explicit disclosure

10:47 22  directed to the elements that are expressly attributed to the

10:48 23  functional language and that there's an exemplary disclosure of

10:48 24  how the functional language is to be effected.

10:48 25      So the only thing you could get to is not that there's

10:48  1   nothing disclosed, but somehow according to attorney argument

10:48  2   only, it's not enough.

10:48  3       What we've done then in Slide 18 is highlight the

10:48  4   structure we identified corresponding to the detection

10:48  5   processor term.  We identified this structure as corresponding

10:48  6   to the detection processor term because that's what the patent

10:48  7   does.

10:48  8       Now, I recognize here it might be a little difficult from

10:48  9   the perspective of the slide.  So what I'm going to do with my

10:48  10  screen is zoom in a little bit so you can maybe read it better.

10:48  11      The intent here is to simply emphasize for the Court in

10:48  12  our briefing we identified Elements 14a, 14a, 14c and 14d,

10:48  13  various agents operating according to the description in the

10:48  14  specification as performing the alleged functional language for

10:49  15  the detection processor.

10:49  16      Let me scroll back out so you can see the entire slide.

10:49  17      Moving on to Slide 20.

10:49  18      We identified exemplary disclosure within the '585 patent,

10:49  19  specifically attributing the detection processor functional

10:49  20  language to these different agents, 114a to 114d, that are

10:49  21  disclosed in the structural context within the figure we just

10:49  22  showed.

10:49  23      The first appears at the bottom of Column 5, and then it

10:49  24  ultimately extends to the top of Column 6.  And reading into

10:49  25  the record the overall description, it says, "Periodically, or

10:49   1   when the electronic message client 2 is closed by the user, the

10:49   2   archiving rule is transmitted to the communication system 1 to

10:49   3   be stored in the database 116.  The message will be moved when

10:50   4   the action contained in the archiving rule is detected by the

10:50   5   communication system 1."

10:50   6        Then moving on to Column 6, Lines 1 through 14, and I

10:50   7   won't read the whole thing, but I want to emphasize a few

10:50   8   points that are highlighted here.

10:50   9        Again, reading from Slide 12 (sic), "Detection of the

10:50   10  performance of an action is rendered possible by using

10:50   11  different agents, 114a to 114d, as mentioned above that control

10:50   12  the different means of the communication system."

10:50   13       Then it says more precisely, and it goes into the

10:50   14  differentiation between 14a and 14d -- or -- well, 14a, b, c

10:50   15  and d -- in providing a more precise description of how they

10:50   16  operate under certain circumstances to detect by the

10:50   17  communication system when the action contained in the archiving

10:51   18  rule is affected.

10:51   19       So, again, what I show on Slide 20 is a portion of the

10:51   20  specification directed to 14a.  Slide -- scroll down here.

10:51   21       Slide 21 then addresses the 14b and provides exemplary

10:51   22  disclosure under certain embodiments of how the 14b can

10:51   23  operate.

10:51   24       Slide 22 addresses 14d.  And we have a description here

10:51   25  also -- I believe this is 14c on Slide 28.

10:51   1       And so our point, Your Honor, is to simply say that while

10:51   2   we pointed to the specific structural elements that the

10:51   3   specification directly attributes to the functional language in

10:51   4   question, in each instance there's exemplary description

10:52   5   associated with each one of those agents in describing how they

10:52   6   operate and interoperate with other components of the system.

10:52   7       To reach the conclusion that there is no structure

10:52   8   disclosed, one would simply have to look past all the

10:52   9   structural description of the agents and how they operate and

10:52   10  also look past the explicit tethering within the specification

10:52   11  itself of this exemplary disclosure to the functional language,

10:52   12  the tethering being affected by use of the same qualifying

10:52   13  terms appearing before the processor terms in question in Claim

10:52   14  9, I believe it is.  And using that same terminology within the

10:52   15  specification.  And then also discussing the functional aspects

10:52   16  of Claim 9 in the context of those specific structural

10:52   17  components.

10:52   18      Okay.  And then, finally, the collaborative application

10:52   19  management processor.  Your Honor, this -- I'm on Slide 24 now

10:53   20  and I'm also showing an excerpt of Figure 1 of the '585 patent.

10:53   21      Highlighted on Slide 24 are the various databases that

10:53   22  appear connected to the collaborative agent 14 -- sorry --

10:53   23  114c.  Included there is the Wiki 107, the blog 108, the FAQ

10:53   24  109, RSS 110, task 111 and planning 112.

10:53   25      And it shouldn't be surprising that in each one of these

10:53  1   instances, these structural database components are described

10:53  2   in turn and in terms of their operations and how they affect

10:53  3   their respective purposes.  These are explicitly tethered in

10:53  4   the figure and in the descriptions to the collaborative agent

10:53  5   interoperating within this overall system.

10:53  6        And, again, they're characterized as databases.  And we

10:53  7   have no evidence, other than attorney argument only from

10:54  8   opposing counsel, that these databases themselves do not

10:54  9   connote structure.

10:54  10       We would submit that the term "database" is a known

10:54  11  term in the art.  It's a known term to connote structure, and

10:54  12  it's not used any differently here in the '585 patent than it

10:54  13  is just in general in terms of a structural term known in the

10:54  14  competing arts.

10:54  15       And, in fact, this is confirmed by use of -- and I'm going

10:54  16  to use my mouse here over Slide 24 -- symbolically use of this

10:54  17  cylinder form is a symbolic representation of a database.  It's

10:54  18  referred to as a database.  It's drawn as a database.  Its

10:54  19  operations are described in the context of a database.  We

10:54  20  submit that that's the structure, the database structure.

10:54  21       And the corresponding description, again, is tethered to

10:54  22  the functional language.  It uses the same qualifying terms

10:55  23  "collaborative application" in describing those databases.

10:55  24       And because of that explicit tethering, the commonality in

10:55  25  the language and the recitation of structure, including its

10:55   1   operation under example embodiments, we submit that for this

10:55   2   term, like all other of the disputed terms claims of Claim 9,

10:55   3   that you simply -- it's indefensible to say that there is no

10:55   4   corresponding structure.  And that's why it's indefinite.

10:55   5       There is corresponding structure.  And we submit that

10:55   6   what's disclosed is sufficient and that the defendant has not

10:55   7   met the burden of clear and convincing evidence in view of what

10:55   8   the specification discloses.

10:55   9       And with that, I'll stop sharing.  And I can take

10:55   10  questions, but that's our presentation for today, Your Honor.

10:55   11      THE COURT:  Okay.  If I could hear a response from Google.

10:55   12      MR. LANIER:  Yes, Your Honor.  Tracy Stitt will respond on

10:55   13  this term.  Thank you.

10:55   14      MS. STITT:  Thank you, Your Honor.  Tracy Stitt for

10:55   15  Google.

10:55   16      And much like Ms. Hartenstein with respect to this term,

10:56   17  we accept the Court's preliminary construction.  And with the

10:56   18  presentation that we just heard, I didn't hear any new

10:56   19  arguments that weren't presented in the briefs.  And we feel

10:56   20  that our briefs fully address those arguments, and those

10:56   21  arguments were fully accounted for in Your Honor's preliminary

10:56   22  constructions.

10:56   23      With that being said, unless you have specific questions,

10:56   24  I'd like to respond on a few points.

10:56   25      First, in terms of the requirement for an algorithm, I

10:56  1   direct you to Page 25 of our opening brief where we did, in

10:56  2   fact, make the argument that there was no algorithm disclosed

10:56  3   for these particular terms.  So I wanted to correct the record

10:56  4   on that.

10:56  5        Second, you heard a lot from Mr. Mangrum about qualifying

10:56  6   terms in -- with respect to these particular means -- or these

10:56  7   particular terms.  And I direct you -- he had Slide 11, his

10:56  8   Slide 11 where he referred to the client management processor

10:56  9   and the detection processor.

10:56  10       The qualifying terms that he relies on really are not

10:56  11  structural descriptors, and we said this in our brief.

10:57  12       Client management and detection merely describe the

10:57  13  function that is attributed to those processors.  It does not

10:57  14  give you any structural detail, nor do the claims explain

10:57  15  anything as to how those functions are achieved.

10:57  16       The assertion that the client management processor is

10:57  17  structurally tied to an electronic message client in and of

10:57  18  itself is not sufficient to disclose structure to avoid the

10:57  19  presumption -- or to avoid the application of 112(6).  And I

10:57  20  would direct you to the Media Rights case for that proposition.

10:57  21       Similarly, with respect to the detection processor,

10:57  22  detection is not a structural connotation.  It simply describes

10:57  23  a function.

10:57  24       They didn't make any similar argument with respect to the

10:57  25  last processor, the collaborative application management

10:57  1    processor in terms of the claims itself.

10:57  2         Similarly, as Ms. Hartenstein said, I believe that we have

10:57  3    addressed their arguments with respect to the requirement of

10:57  4    expert testimony here.  We do not believe that expert testimony

10:58  5    is required.  And, in fact, the citations that they make to

10:58  6    their specification demonstrate that it is apparent that

10:58  7    there's no structural description for these terms.  And, in

10:58  8    fact, they are only described in terms of their function.

10:58  9         To address Slide 17 through 25 where Mr. Mangrum

10:58  10   pointed to particular cites from the specification.  Some of

10:58  11   these are a little more detailed than what we saw in their

10:58  12   briefs, but we believe that these have all been sufficiently

10:58  13   addressed in our briefing.  And they all -- regardless, they

10:58  14   all suffer from the same substantive laws, and they add nothing

10:58  15   to the substance.

10:58  16        And the problem is that nothing in the spec, in fact,

10:58  17   describes anything other than the function of these particular

10:58  18   processors.

10:58  19        For example, if we look at Slide 20 that Mr. Mangrum put

10:59  20   up, he discusses the detection processor and he relies on

10:59  21   language that talks about the detection processor is

10:59  22   rendered -- excuse me.  "Detection of the performance of an

10:59  23   action is rendered possible by using different agents."  This

10:59  24   is at 6 -- Column 6, Lines 1 through 14.

10:59  25        And it goes on to describe that "regular analysis by such

10:59  1  agents enables detection of the events effected on such means."

10:59  2  All that does is describe the function of this processor.  It

10:59  3  does not explain any structural detail with respect to the

10:59  4  processor in terms of circuitry or provide any other

10:59  5  explanation as to how that processor operates.  And we know

10:59  6  from the case law that that is what is required here.

10:59  7       And for that reason, as we've stated in our briefs, for

10:59  8  none of these three terms does there exist a disclosure of

10:59  9  sufficient structure.

10:59  10       If Your Honor has any particular questions, I would be

10:59  11  happy to answer them.  Otherwise, I think the arguments have

10:59  12  been addressed in our briefs.

10:59  13       THE COURT:  Mr. Mangrum, any response?

11:00  14       MR. MANGRUM:  Yes, Your Honor.  Thank you for the

11:00  15  opportunity.

11:00  16       I want to share my screen, and I want to read into the

11:00  17  record exactly what the defendant said in its briefing because

11:00  18  I think there's a misrepresentation today of what was said.

11:00  19       So I have that now.  This is -- I just pulled up their

11:00  20  brief, and I've highlighted the section I want to read into the

11:00  21  record.

11:00  22       Their argument in their briefing on the page that was just

11:00  23  cited is, "Instead, the specification simply repeats each

11:00  24  claimed function, but it does not provide any algorithm or

11:00  25  other structure for carrying out that specific function."

11:00    1        So we understood from their argument that there wasn't --

11:00    2    this -- the claim language did not invoke like a WMS Gaming or

11:00    3    Aristocrat type of discussion.  They never raised that.  We

11:00    4    thought it didn't either, and so we didn't address that in our

11:00    5    briefing.

11:00    6        They did not say, "it must disclose an algorithm and other

11:01    7    structure," or they didn't just -- if -- the problem is they're

11:01    8    reading this statement now as if they never said "or other

11:01    9    structure."  And they're reading it as if they said the

11:01   10    specification simply treats each claimed function, but it does

11:01   11    not provide any algorithm, period.

11:01   12        That's not what they said.  It's not what they argued.

11:01   13    And so naturally in our response we addressed it based off --

11:01   14    because they're the party with the burden -- based off what

11:01   15    they argued.

11:01   16        If Your Honor feels that this term somehow invokes

11:01   17    WS Gaming or Aristocrat and that there needs to be some type of

11:01   18    algorithmic structure disclosed in addition to the specific

11:01   19    structural components that we identified, then we would submit

11:01   20    that that would probably be appropriate for supplemental

11:01   21    briefing because it wasn't briefed by Google.

11:01   22        And then also -- I just want to point out when they

11:01   23    cherry-picked from the slides that we showed, the slides

11:02   24    were -- not every slide was intended for the same purpose.

11:02   25        We showed slides first of all to establish that there was

11:02  1   an explicit tethering or connection between the particular

11:02  2   component, the structural component identified in the

11:02  3   disclosure in the specification to the functional language in

11:02  4   question.

11:02  5        And it stands to reason that in those instances, this --

11:02  6   I've written hundreds of patents, and it's normal practice when

11:02  7   you are introducing a term that you intend to match up with

11:02  8   certain claim language that you match the claim language.  You

11:02  9   write the term, and you match the claim language, and then what

11:02  10  follows is additional corresponding description under certain

11:02  11  example embodiments.

11:02  12       So to show that certain structural components are

11:02  13  explicitly tied to the alleged functional language, we pointed

11:03  14  to instances in the specification where this is so.  But then

11:03  15  following that, we identified other instances of exemplary

11:03  16  disclosure.

11:03  17       And I agree.  I think the record reflects that our

11:03  18  presentation today is an accurate summary of the briefing and

11:03  19  that the record and the intrinsic evidence speaks for itself.

11:03  20       If you just do a control F on the structural components we

11:03  21  identified, you'll see them referenced throughout the

11:03  22  disclosure, each one of them in the context of the description

11:03  23  of example embodiments describing how those particular

11:03  24  components operate, what they do, what they are, where they're

11:03  25  located and how they interact with other components.

11:03  1     In view of that disclosure, to reach the conclusion that

11:03  2  there's no structure at all, we submit, again, it's just not

11:03  3  consistent.  And to the extent Your Honor wants to entertain a

11:03  4  separate disclosure -- or sorry -- a separate dispute as to

11:03  5  whether or not an algorithmic disclosure is necessary, we would

11:04  6  submit it's extraneous to the present briefing, and that would

11:04  7  warrant additional supplemental briefing.

11:04  8     MS. STITT:  Your Honor, if I may respond briefly.

11:04  9     THE COURT:  Yes, ma'am.

11:04  10     MS. STITT:  With respect to whether there is -- an

11:04  11  algorithm is required, this is a computer-implemented

11:04  12  invention.

11:04  13     The functions that are described by these processors are

11:04  14  special-purpose functions.  And so, therefore, I think that --

11:04  15  to say that an algorithm may not be required or that we didn't

11:04  16  suggest that it would be belies the record.

11:04  17     And second, with respect to the slides, I'm happy to go

11:04  18  through each of them in more detail to explain why what's cited

11:04  19  on those slides fails to explain any structural detail or

11:04  20  describe these processors in anything other than functional

11:04  21  language.

11:04  22     There's no disclosure as to how the particular processor

11:04  23  performs or operates so as to accomplish the function.  It's

11:04  24  merely described in terms of the function itself, and that is

11:04  25  insufficient under either Step 1, to determine whether there is

11:05  1   a means-plus-function analysis that should be applied, or Step

11:05  2   2, which is once you get there, whether there's sufficient

11:05  3   structure disclosed in the specification.

11:05  4        THE COURT:  Anything else?

11:05  5        MR. MANGRUM:  None from the patent owner.  Or sorry.  From

11:05  6   the plaintiff, Your Honor.  And I appreciate the opportunity.

11:05  7        THE COURT:  You're very welcome.  I'll be back in a few

11:05  8   seconds.

11:05  9        (Pause in proceedings.)

11:08 10        THE COURT:  If we can go back on the record.

11:08 11        The Court is going to maintain its preliminary claim

11:08 12   constructions with respect to all of those arguments on

11:08 13   Claim 9, which I think leaves us with one final argument on the

11:08 14   579, "client-side compositing of media streams."

11:08 15        Mr. Mangrum?

11:08 16        MR. MANGRUM:  Yes, Your Honor.  I'll be arguing this term

11:08 17   as well.

11:08 18        For this one, I think it might be helpful just to do a

11:08 19   side-by-side comparison of Claims 1 and 7.  If I can share.

11:09 20        Your Honor, if you can confirm that this is not too small

11:09 21   a text to be able to see.

11:09 22        THE COURT:  Well, that's a little hurtful.  No.

11:09 23        (Laughter.)

11:09 24        THE COURT:  No.  It's fine.  Actually, my reading

11:09 25   eyesight's great.  Not so good long-distance driving, but I

11:09  1    still can read without glasses.  So I'm in good shape.  Thank
11:09  2    you.
11:09  3         MR. MANGRUM:  Well, just to be clear, my -- when I share
11:09  4    this in this way, I don't see exactly what you're seeing.  So I
11:09  5    wanted to be certain.  But thank you for confirming that.
11:09  6         So what I've done here is try to highlight using different
11:09  7    coloring a slide-by-slide comparison of Claims 1 and 7.  This
11:09  8    is -- so we've moved on to a different case.  This is the 579
11:09  9    case.  It's the '180 patent.
11:09  10        And what's important to recognize here for the '180 patent
11:09  11   is that these various method claims are expressly written from
11:09  12   the perspective of a particular device.  This is not disputed.
11:10  13   You can see that in both parties' briefings.
11:10  14        So in Claim 7, there's a method for client-side
11:10  15   compositing of media streams by a video server.  Okay?  And
11:10  16   then the method instead in Claim 1 is appropriately directed to
11:10  17   operations by a video display device.
11:10  18        What I've highlighted within the body of the claims for
11:10  19   Claim 7 is that after every operative gerund that introduces a
11:10  20   step, like generating, multiplexing, transmitting, there's a
11:10  21   comma and then an affirmation of what's clear in the preamble,
11:10  22   which is that all these things are done by a video server.
11:10  23        If anything, the portion of the preamble that should be
11:10  24   limiting is "via video server."
11:10  25        Why?  Because in each instance in the body of the claim,

11:11   1   the word "the video server" derives its antecedent basis from a

11:11   2   video server.  And it's explicit for each step that's required

11:11   3   what component is doing it because after -- again, after the

11:11   4   gerund, it says "by the video server."

11:11   5        Now, you juxtapose this with the context of Claim 1.  So

11:11   6   to emphasize the distinction I've colored differently -- maybe

11:11   7   it'll come out on your screen somewhat orange -- of instances

11:11   8   where "by a video display device" or "the display device" is

11:11   9   emphasized.

11:11   10        So in each instance when you have an operative gerund

11:11   11   introducing a step, here it's receiving, demultiplexing and

11:11   12   displaying, the -- it looks like I missed one.  I should have

11:11   13   highlighted this orange as well, right here after receiving.

11:11   14        But in every instance what you have is an antecedent

11:12   15   reference to the preamble requirement, "by a video display

11:12   16   device."  And in every instance you have specifically called

11:12   17   out what component is doing the step.

11:12   18        Now, the displaying step is of particular importance, and

11:12   19   I've highlighted this yellow to emphasize that after it says

11:12   20   "displaying, by the video display device," there's the

11:12   21   statement, "the at least one media substream on the display

11:12   22   screen according to the compositing-instruction substream.  The

11:12   23   compositing-instruction substream, including instructions on a

11:12   24   composition of the at least one media substream."

11:12   25        So you have to do the compositing at the video display

11:12  1   device because it's recited, right?

11:12  2        Now, why is that significant?  When you -- we start with a

11:12  3   preamble assessment with the presumption that the preamble's

11:13  4   not limiting, and the -- or a portion when you bifurcate

11:13  5   selections of a preamble.  Because we don't dispute that "via

11:13  6   the video display device" is limiting because it's the thing

11:13  7   that provides antecedent basis for each instance of "the video

11:13  8   display device."

11:13  9        But just to suggest client-side compositing is of itself

11:13  10  an additional limitation would overlook the fact that what you

11:13  11  have here in Claim 1 is a specific reference to the compositing

11:13  12  in accordance with the instructions of the

11:13  13  compositing-instruction substream.

11:13  14       So in instances where you have specific elements within a

11:13  15  claim, claim language that calls out something that's

11:13  16  introduced in a preamble, that further underscores the

11:13  17  presumption that the preamble's not limiting.  And that in this

11:13  18  case, the phrase in question is directed to a purpose of the

11:14  19  method because you have specific claim language directed to the

11:14  20  compositing.

11:14  21       Now, look at what happens instead over at the Claim 7.

11:14  22       So Claim 7 you have -- you generate by video server, you

11:14  23  multiplex by the video server and you transmit.  And what are

11:14  24  you transmitting by the video server?  You're transmitting the

11:14  25  multiplex data stream to be displayed on the display screen

11:14  1   according to the compositing-instruction substream, but therein

11:14  2   you're done, right?

11:14  3        All the steps here are recited in the context of the video

11:14  4   server.  When you transmit, that transmission is all that

11:14  5   Claim 7 requires.  It doesn't have, unlike Claim 1, additional

11:14  6   limitations directed to client-side compositing, right?

11:14  7        So the patentee, when he wanted steps within a body of a

11:14  8   claim to refer to client-side compositing, they're explicitly

11:15  9   recited.

11:15  10       Here, to remove all doubt from the -- of the perspective

11:15  11  of -- the patentee -- sorry.  I'm -- it's like I'm redrafting a

11:15  12  brief in my head as I speak.

11:15  13       But the patentee here on Claim 7 could have just said "the

11:15  14  method comprising," right?  And often that's what you see for

11:15  15  preamble phrases.

11:15  16       But instead to be -- make it very clear, what should

11:15  17  already be clear in the language of the claim that each step is

11:15  18  performed by the video server, what you see here in the

11:15  19  preamble itself is saying this method is effected by a video

11:15  20  server.

11:15  21       How do you know that?  Because each step also says "by the

11:15  22  video server."

11:15  23       So when you transmit the multiplex data and, of course,

11:15  24  perform the preceding steps recited in Claim 7, to suggest then

11:15  25  and thereafter more is required to infringe Claim 7, we feel

11:15  1    would be a departure from what is recited in Claim 7,

11:16  2    particularly in view of Claim 1.

11:16  3         And an analysis of these claims side by side is important.

11:16  4    Courts often do this.  They often do this because under the

11:16  5    Doctrine of Claim Differentiation and other claim construction

11:16  6    doctrines, the recitations in one claim could be informative as

11:16  7    to the interpretation in other claims.

11:16  8         We've seen that today.  We've seen that when you have

11:16  9    instances where means-plus-function construction -- or

11:16  10   limitations are recited in one claim and not another.  Other

11:16  11   claims are recited in Beauregard format.  This underscores

11:16  12   distinctions that are evident in the claim.

11:16  13        So here there could be no question that there's a

11:16  14   distinction at least in the context of perspective.  It's made

11:16  15   explicit in the preamble.

11:16  16        And we would submit that once the generating multiplexing

11:16  17   and transmitting is done by the video server, all these are

11:16  18   intended for the purpose of client-side compositing.  But

11:16  19   that's what happens.  The video server transmits this when

11:16  20   other things -- because of the way things are generated,

11:17  21   because of the way things are multiplexed, and because of the

11:17  22   way things are transmitted, this all facilitates client-side

11:17  23   compositing.

11:17  24        But it doesn't then further require a user to turn on

11:17  25   their computer or to drink a cup of coffee or to, you know, log

11:17  1  onto the Internet.  Like while all those things might happen,

11:17  2  ultimately what's set forth in the claim is the claim

11:17  3  requirements.

11:17  4      And we've heard in other briefings and in arguments, oral

11:17  5  arguments before Your Honor, that the name of the game is the

11:17  6  claim, and that's true here.

11:17  7      This recites three steps.  There's not a fourth step.  And

11:17  8  to suggest Claim 1 recites what would effectively be another

11:17  9  operative gerund ignores the -- that the call-out within the

11:17  10 claim language itself, that the compositing-instruction

11:17  11 substream is what provides the instructions for the compositing

11:17  12 when it says according to the compositing-instruction

11:18  13 substream.

11:18  14     I wanted to make certain that these points from our

11:18  15 briefing were clear.  And I'm happy to address any questions

11:18  16 Your Honor has.

11:18  17     But, again, our focus in our briefing was on a comparative

11:18  18 analysis between Claims 1 and 7 and an emphasis on what the

11:18  19 claim language itself says these steps are effected by.

11:18  20     And I'll stop sharing.

11:18  21     MR. LANIER:  Your Honor, Sanjiv Laud will respond for

11:18  22 Google.  Thank you.

11:18  23     MR. LAUD:  Good morning, Your Honor.

11:18  24     Could we start with Slide 15, please?

11:18  25     Your Honor, I just want to start by noting that the fact

11:19 1 that the server claims in this patent -- and Claim 7 isn't the

11:19 2 only one -- recite client-side compositing is evidence of how

11:19 3 important client-side compositing is to the invention here.  It

11:19 4 appears in every preamble of every claim of the patent.

11:19 5 I think what you heard today from Mr. Mangrum is that the

11:19 6 plaintiff believes there's an inconsistency behind applying the

11:19 7 requirement of client-side compositing to the server-side

11:19 8 claim.  And I want to demonstrate to you how that's not

11:19 9 inconsistent.

11:19 10 Let's go to Slide 16 for the moment.

11:19 11 This is from the specification of the patent, Your Honor.

11:19 12 It's Figure 1 showing the system having a video server and a

11:19 13 video display device.  You can think of this as DirecTV and

11:19 14 YourTV, for example.

11:19 15 The specification explains that instead of compositing all

11:19 16 the data streams at the video server as was done in the prior

11:20 17 art as described in the first column of the patent, the video

11:20 18 display device composites and displays at least one of the

11:20 19 media streams.

11:20 20 So you have these two components operating in tandem.  You

11:20 21 have your video server, which is wrapping up and bundling all

11:20 22 of the media streams as well as a descriptor substream that

11:20 23 tells you what's in there and the compositing-instruction

11:20 24 substream that is the fundamental essence of the invention.

11:20 25 And then on the other side you have the video display

11:20  1   device which receives all of that and, unlike the prior art,

11:20  2   composites the video at the video display device.

11:20  3        Let's go back to the previous slide so we can look at the

11:20  4   claim language.

11:20  5        There is nothing inconsistent with applying the limiting

11:20  6   phrase from the preamble "client side compositing of media

11:21  7   streams" with the rest of this claim.  This claim is directed

11:21  8   to the functions that are shown in that Figure I just showed

11:21  9   you and described in much more detail in the specification.

11:21  10       It's generating the compositing-instruction substream.

11:21  11  It's multiplexing that with the descriptor substream and the

11:21  12  media substreams.  And then it's transmitting that to the

11:21  13  client device to be displayed on the display screen.

11:21  14       There's nothing inconsistent about the server performing

11:21  15  the intended functions in this system, preparing them to be

11:21  16  composited on the client side.

11:21  17       And I want to be clear about how we understand that.  I

11:21  18  think Mr. Mangrum is saying we are trying to import an

11:21  19  additional method step into this claim.  I don't think that's

11:21  20  the right way to understand it.

11:21  21       What we're saying, Your Honor, is that the compositing

11:21  22  can't happen at the server side because it must be client-side

11:21  23  compositing.  That's the whole purpose of the invention.  That

11:22  24  is the invention of this patent, as I think we made clear in

11:22  25  our briefs.

11:22  1        So I don't believe there's any inconsistency in saying

11:22  2   that the last limitation here "transmitting by the video server

11:22  3   the multiplex data stream to be displayed on the display

11:22  4   screen" means that that is to be composited and displayed on

11:22  5   the display screen by the client-side device.  That's how we

11:22  6   understand the claim.

11:22  7        We don't dispute that a server could in theory infringe

11:22  8   this claim without need of a step being performed on a

11:22  9   client-side device.  We're not trying to make that type of

11:22  10  divided infringement argument, or that there has to be control

11:22  11  over both portions of the device.  That's not the purpose of

11:22  12  our argument here, Your Honor.

11:22  13       It's simply to clarify that the whole invention of this

11:22  14  patent is client-side compositing as opposed to server-side

11:22  15  compositing.  And we believe that fits naturally with Claim 7

11:22  16  as drafted.

11:22  17       If Your Honor has any other questions, I'm happy to answer

11:23  18  them.  Otherwise, we'll rest on our briefs.

11:23  19       THE COURT:  That was very well done.

11:23  20       Mr. Mangrum?

11:23  21       MR. MANGRUM:  Yes.  Thank you, Your Honor.

11:23  22       Just a couple of points.  Our position is not then that

11:23  23  their interpretation is inconsistent.  It has been that the

11:23  24  transmitting step -- let me share, again, so we can walk

11:23  25  through the claim language one last time.

11:23  1       Okay.  This transmitting step is the last step.  You just

11:23  2   heard that from opposing counsel, and we agree.  When the

11:23  3   server transmits -- this is the video server -- when it

11:23  4   transmits the multiplex data stream to be displayed at some

11:23  5   future time, I believe opposing counsel just used the words "to

11:23  6   prepare for compositing."  We agree that's the last step.

11:23  7       Once the transmitting occurs, what is required -- and

11:23  8   provided the generating and multiplexing has occurred, once

11:24  9   the -- what opposing counsel referred to as the transmitting,

11:24  10  the last step, once that occurs, that's all that was required.

11:24  11      And so it's not a question of whether or not is it

11:24  12  consistent if the client side does compositing.  It's whether

11:24  13  you have to further add, in addition to the transmitting, a

11:24  14  compositing by the video display device the transmitted

11:24  15  multiplex data stream.  That's effectively what they're asking

11:24  16  to Court to do.

11:24  17      And we submit -- and you just heard from the other side

11:24  18  that transmitting's the last step.

11:24  19      Once the video server transmits, there need not be a

11:24  20  separate and additional compositing step.  And we know that

11:24  21  partially because of the way when the tables are flipped --

11:24  22  sorry.  I said tables.  What I mean is perspective.

11:24  23      When the perspective switches to the video display device,

11:24  24  you're not preparing to display, right?  You are displaying

11:25  25  based off what had been transmitted.

11:25    1        So Claim 1 is a little bit different in that because of

11:25    2   its unique perspective, it talks about what happens after the

11:25    3   transmission occurs, and that includes discussion of the

11:25    4   compositing data stream.

11:25    5        So the fact that all of these claims reference this

11:25    6   overarching purpose does not mean that then becomes a claim

11:25    7   limitation.  When the compositing at the video display device

11:25    8   is a claim limitation, it's called out.

11:25    9        When in Claim 7 the transmitting being the last step is

11:25   10   executed, that's all that's required.

11:25   11        And so our construction has simply been:  Follow the claim

11:25   12   language and nothing extraneous to the claim language is

11:25   13   required.

11:25   14        MR. LAUD:  If I may, Your Honor, just a brief response.

11:25   15        THE COURT:  Of course.

11:26   16        MR. LAUD:  On Claim 7 let me just note, I think there's a

11:26   17   little confusion.  At least I'm confused as to what the

11:26   18   plaintiff is arguing.  It seems they're either arguing that the

11:26   19   claim doesn't require any compositing at all, which doesn't

11:26   20   make sense with the invention, or they're saying that

11:26   21   server-side compositing is encompassed by the claim language

11:26   22   contradicts the purpose of the invention, and as we said in our

11:26   23   briefs, just about everything in the patent.

11:26   24        So I'm not sure which of those it is, but I don't think it

11:26   25   matters because --

11:26  1      Could we look at Slide 10?

11:26  2      -- you don't look at the claim language in isolation.  We

11:26  3  cited a case in our responsive brief.  It's Corning Glassworks,

11:26  4  Page 32 of our response brief.

11:26  5      The Federal Circuit has told us whether a claim preamble

11:26  6  is limiting can only be resolved on review of the entire patent

11:26  7  to understand what the inventors actually invented and intended

11:26  8  to encompass by the claims.

11:26  9      And we think in this case it's very clear what we would

11:27  10  call the Poly-America test is satisfied here.  This case is on

11:27  11  all fours with the Federal Circuit's decision in Poly-America.

11:27  12      The specification of this patent is replete with

11:27  13  references to client-side compositing.  It is the title of the

11:27  14  invention.  It's the first sentence of the abstract.  It's the

11:27  15  summary of every embodiment.  There is no embodiment that does

11:27  16  not involve client-side compositing.  It's repeated in every

11:27  17  claim.

11:27  18      It's clear from all of that the inventors considered this

11:27  19  to be important, and beyond important, a fundamental

11:27  20  characteristic of the invention.  It's not just an intended use

11:27  21  or purpose.  It is the invention, and, therefore, it's properly

11:27  22  construed as a limitation of the claim itself.

11:27  23      With that, Your Honor, nothing further from Google.  Thank

11:27  24  you.

11:27  25      THE COURT:  Mr. Mangrum?

11:27  1        MR. MANGRUM:  Yeah.  I don't know if Your Honor shares the

11:27  2   same confusion, but I want to at least address the point that

11:27  3   was raised if that would be helpful.  And it is that it's

11:27  4   not -- we're not making the argument that you have to do

11:28  5   server-side compositing under Claim 7.  That's not the

11:28  6   position.

11:28  7        The position is that the claim does not have any explicit

11:28  8   requirements post-transmission, right?  And I think we heard a

11:28  9   concession on that point today.  So you can't do client-side

11:28  10  compositing prior to transmitting, and transmitting is the last

11:28  11  step.

11:28  12       Now, these types of steps operating in cooperation with

11:28  13  each other, the generating, multiplexing and transmitting are

11:28  14  all set up to facilitate what is expressed as a purpose in the

11:28  15  preamble, and that occurs thereafter.  And I think that point's

11:28  16  now uncontested.

11:28  17       But to suggest Claim 7 further requires, in addition to

11:28  18  these three steps, compositing does not comport with the claim

11:28  19  language.

11:28  20       We would also submit, Your Honor, that there is a lot of

11:28  21  authority -- and I'm sure Your Honor's aware of it -- where

11:29  22  there's no legally recognizable reducing something down as an

11:29  23  essential element or a gist or heart of the invention.  And one

11:29  24  example is the Allen case.  That's 299 F.3d 1336.

11:29  25       And also let me give you another citation, Ormco Corp.,

11:29   1    498 F.3d 1307.  And there the Federal Circuit said, "This Court

11:29   2    has rejected a claim construction process based on the essence

11:29   3    of an invention."  And so -- and that was a 2007 case.

11:29   4       So to suggest, okay, transmitting's the last step, but we

11:29   5    want all the claims to further require an additional and

11:29   6    unrecited step because client-side compositing somehow is the

11:29   7    essence or gist of the invention.

11:29   8       It is already, I think, defeated by the concession that

11:29   9    transmitting is the last step but also is inconsistent with

11:29  10    authority that says you don't add claim limitations that aren't

11:30  11    recited ostensibly because those are necessary or the gist or

11:30  12    the heart of the invention.

11:30  13       Claim language controls for Claim 7.  There's no

11:30  14    compositing.  For Claim 1 there is in the displaying step.  And

11:30  15    so to suggest we should add and import limitations from a

11:30  16    non-limiting aspect of the preamble we submit is not consistent

11:30  17    with the plain and ordinary meaning.

11:30  18       MR. LAUD:  Your Honor, I think the argument amounts to

11:30  19    don't believe your lying eyes.  The --

11:30  20       THE COURT:  Can you all give me just one second?

11:30  21       MR. LAUD:  Of course.

11:30  22       (Pause in proceedings.)

11:30  23       THE COURT:  Okay.  Thank you, sir.

11:30  24       You can continue, please.

11:30  25       MR. LAUD:  Thank you.

| | | |
|---|---|---|
| 11:31 | 1 | The Federal Circuit has made clear that the essence of the |
| 11:31 | 2 | invention is important.  In fact, that's pretty much one of the |
| 11:31 | 3 | most important aspects of the patent for determining whether a |
| 11:31 | 4 | preamble's limiting. |
| 11:31 | 5 | I would point Your Honor to the Vizio case that we cited |
| 11:31 | 6 | in our briefs.  That's 605 F.3d 1330 at 1341, where the Federal |
| 11:31 | 7 | Circuit concluded on very similar technology that decoding in |
| 11:31 | 8 | an MPEG-2 transport stream was the essence or a fundamental |
| 11:31 | 9 | characteristic of the claimed invention, and, therefore, even |
| 11:31 | 10 | though it was a preamble, it was a limitation of the claims. |
| 11:31 | 11 | Thank you. |
| 11:31 | 12 | THE COURT:  You're welcome.  Thank you. |
| 11:31 | 13 | I'll be back with you all in a few seconds. |
| 11:31 | 14 | (Pause in proceedings.) |
| 11:32 | 15 | THE COURT:  If we could go back on the record, please. |
| 11:32 | 16 | The Court is going to maintain its preliminary |
| 11:32 | 17 | construction that the claim term is limiting. |
| 11:32 | 18 | A couple of things to take up:  One, we will get out a |
| 11:32 | 19 | resolution in the next day or so of the one claim term I've |
| 11:32 | 20 | left up in the air.  And we'll get that done very quickly. |
| 11:32 | 21 | I'll just pick on Mr. Mangrum because I can see your face |
| 11:32 | 22 | right in front of me. |
| 11:32 | 23 | Do we have a trial date set in this case yet? |
| 11:32 | 24 | MR. MANGRUM:  Yes.  We do, Your Honor. |
| 11:32 | 25 | THE COURT:  And how many patents do we have set in this |

| 11:32 | 1 | case? |

11:32   2       MR. MANGRUM:  Let me confirm.

11:33   3       15, Your Honor.

11:33   4       THE COURT:  So here's what I would like you all to do.

11:33   5       Mr. Lanier, I'll put you in charge, but of course -- hold

11:33   6   on one second.

11:33   7       Okay.  Apparently the first trial is set for March, a

11:33   8   year.  I'd like for you all to get together.  I picked on

11:33   9   Mr. Lanier, but of course you all can self-assign.

11:33  10       But we're not going to do 15 patents in a case -- I'm

11:33  11   sorry -- in a trial.  We probably won't do them maybe even in

11:33  12   two trials, even though I guess patents could fall away as we

11:33  13   go through, you know, the course of everything.

11:33  14       What I would like for you all to do is -- now, let me

11:33  15   start over.

11:33  16       Mr. Lanier, you and Mr. Mangrum and others, you're all big

11:33  17   boys.  If you'd say we could do 15 patents in a trial, then,

11:33  18   you know, I'll set aside enough time to do it.  But my guess is

11:34  19   that's probably not what Google would want.  And so -- it's not

11:34  20   what I would want if I were Google, so I'm just presuming that.

11:34  21   So I'm not sure it's -- I'm not sure it's what the plaintiff

11:34  22   wants either.

11:34  23       So if you all can get together and figure out what

11:34  24   grouping of patents -- probably if there are -- if there are

11:34  25   more than ten patents, we may need three trials even though

11:34   1   I'll be -- you know, we'll be stacking up trials at that time.

11:34   2   But for sure we can get one done.

11:34   3       I feel relatively comfortable we can do between four and

11:34   4   six patents in a trial if -- hopefully there may be a grouping

11:34   5   of technology.  There may be a grouping of accused products,

11:34   6   something that tethers them together.  I'll let you all take

11:34   7   the first crack in telling me what group you think makes sense

11:35   8   to go to trial first.

11:35   9       Probably what we'll do -- what we've done so far in the

11:35   10  Intel case, and it's worked -- I think it's worked well.  Maybe

11:35   11  there would be disagreement among the lawyers.  But what we did

11:35   12  was we kept the timing of everything, for example, all 15

11:35   13  patents the same as though they were all going to trial on that

11:35   14  March date.  But we knew going in that they weren't all going

11:35   15  to be tried.  And that's worked pretty well because, you know,

11:35   16  we've had seriatim pretrial conferences now and done other

11:35   17  things.

11:35   18      And, obviously, now that I know more about what's going on

11:35   19  in that case, it's helping me -- we had a pretrial hearing

11:35   20  yesterday that was much easier because I've been through this

11:35   21  once.  We've all been through it once.

11:35   22      So we will keep everything -- for scheduling discovery

11:36   23  expert reports, everything like that, we will keep the trial

11:36   24  date as though it's all 15 patents.  But I'm telling you I'm

11:36   25  not going to try 15 patents, and I would like for you all to

11:36  1   come up with a number that's between, say, four and five, six,

11:36  2   seven, something like that that you all -- both sides feel will

11:36  3   be comfortable we could try.

11:36  4       And I will give you an appropriate amount of time for

11:36  5   whatever number of patents we're trying.  I think we had -- we

11:36  6   had a disagreement in trial.

11:36  7       We had 14 or 15 hours in the last trial I had.  And the

11:36  8   reason I say that is because they didn't use up all the time.

11:36  9   So I don't know how much time I actually -- I can't remember.

11:36  10      But I can assure both sides I will give you adequate time

11:36  11  to try your case, depending on the number of patents you tell

11:36  12  me that we're going to be trying in that case.

11:36  13      I will set a number of hours based on the number of

11:36  14  experts you tell me you're going to have, witnesses you tell me

11:37  15  you're going to have.  And I'll make sure that the plaintiff

11:37  16  has an adequate amount of time to try their case and put on a

11:37  17  short rebuttal case and that Google has an opportunity to

11:37  18  defend its case and put on its case-in-chief.  So I will

11:37  19  guarantee you that.

11:37  20      So even though I'm continuing to believe -- and I'll give

11:37  21  you this, my only lecture from the bench, time -- a shorter

11:37  22  amount of time.  None of you believe me.  I wouldn't believe me

11:37  23  when I was on your side of the bench.  Less time is better for

11:37  24  everyone.  It makes things -- it makes the jury happy, and it

11:37  25  makes you all less repetitive.

11:37  1      But I want everyone on this -- I want everyone to feel

11:37  2  like they had an adequate amount of time to present their case.

11:37  3  And so I will do my very best to give you the amount of time

11:37  4  that I can, given my schedule, to give you all -- allow you to

11:37  5  try the case with as many hours as possible.

11:38  6      Is there anything -- I'll start with plaintiff's counsel.

11:38  7  Is there anything we need to take up?

11:38  8      MR. MANGRUM:  This is Brett Mangrum for plaintiff.  And

11:38  9  not at this time, Your Honor.  Thank you for your time.

11:38  10      THE COURT:  Mr. Lanier?

11:38  11      MR. LANIER:  Your Honor, thank you for that.  Thank you

11:38  12  for that guidance.  Only -- we agree with the approach Your

11:38  13  Honor's outlined.  That makes good sense to us.  We'll work

11:38  14  with Mr. Mangrum and team to come to a proposal.

11:38  15      My only question -- and it's guessing, I understand, that

11:38  16  is.  Does Your Honor have a sense if we were to, say, have

11:38  17  three trials, are they going to be back to back to back or

11:38  18  staged out by a month --

11:38  19      THE COURT:  No.  I can tell without any equivocation, they

11:38  20  will not be back to back.  I don't think it's -- number one,

11:38  21  it's not fair to you guys.  It's not fair to your clients, and

11:38  22  it's not fair to you all.

11:38  23      Number two, when I -- by March of 2022, we have plenty to

11:38  24  do already in March.  We have plenty to do already in April.

11:39  25  And I -- what I will tell you all, I'm going to try and figure

11:39  1    out as I learn what I'm doing, I guess our trial in the first

11:39  2    Intel case -- gosh, I lost track.  The next one's in April.

11:39  3        If I feel like I did not give them enough time between

11:39  4    trials to get ready, then I will probably spread the -- you

11:39  5    know, by a month or so -- I think I gave two or three months

11:39  6    between.  In this case, given the number of patents there are,

11:39  7    I might make sure there was like, say, at least two or three

11:39  8    months, you know, between the trials to make sure that you all

11:39  9    had adequate time to get ready for the next trial and do other

11:39  10   things in your life that you have to do professionally and all

11:39  11   that.

11:39  12       So I will be very -- I will have much -- they will not be

11:39  13   back to back.  I will have much more real-world experience

11:39  14   next -- when we're setting them next -- you know, when I start

11:40  15   setting them to have an idea of what's the fairest thing to you

11:40  16   all to do.  And so...

11:40  17       MR. LANIER:  Your Honor, thank you for that.  We

11:40  18   appreciate that really clear guidance.  That helps us plan.

11:40  19       I join Mr. Mangrum in thanking Your Honor for the time and

11:40  20   leave you only with the testimony that my team will tell you

11:40  21   that I am a fervent believer in time limits and page limits,

11:40  22   and we will make it work.

11:40  23       So thank you, Your Honor.

11:40  24       THE COURT:  Well, time limits are -- I just cannot tell

11:40  25   you how much better off you are by limiting what you're doing.

| | | |
|---|---|---|
| 11:40 | 1 | It's putting -- even if I didn't give you time limits, I would |
| 11:40 | 2 | tell you all to impose self-time-limits.  It's so much better |
| 11:40 | 3 | for the jurors. |
| 11:40 | 4 | But you all continue to say almost every hearing -- |
| 11:40 | 5 | Mr. Jones can tell me if I'm lying because I think he's been on |
| 11:40 | 6 | dozens of these hearings now -- I try and say this at every |
| 11:40 | 7 | hearing.  The reason when the press continues to question why I |
| 11:41 | 8 | handle so many patent cases, I don't think anyone enjoys |
| 11:41 | 9 | handling them more than I do. |
| 11:41 | 10 | I know Mr. Jones would say there are judges in the Eastern |
| 11:41 | 11 | District who enjoy them as much and are certainly probably |
| 11:41 | 12 | better at handling than I am.  But the lawyers, every time I |
| 11:41 | 13 | have a hearing, are exceptional.  It's a real credit to your |
| 11:41 | 14 | clients, the quality of lawyers I get in every single case. |
| 11:41 | 15 | This was no exception.  It's the very best lawyers. |
| 11:41 | 16 | And every hearing I have, I have to prepare very hard for |
| 11:41 | 17 | because it's like a final exam over and over with the very best |
| 11:41 | 18 | lawyers in America and all across America. |
| 11:41 | 19 | You know, I don't think any federal judges, other than, |
| 11:41 | 20 | again, some in the Eastern District and maybe in Delaware, have |
| 11:41 | 21 | the breadth of national lawyers that I do in my court on a -- |
| 11:41 | 22 | you know, on an every-hearing basis.  And I take great pride in |
| 11:42 | 23 | that and what we've done in the court.  And so this was another |
| 11:42 | 24 | example of why I have the best job in the world. |
| 11:42 | 25 | So you all have a -- it's not Friday, is it?  It's |

11:42   1   Thursday.

11:42   2        Despite that, it's been a long week.  I've had a lot of

11:42   3   Markmans and other hearings already.

11:42   4        You all have a wonderful rest of the week.  Have a great

11:42   5   weekend.  I look forward to seeing you hopefully in person in

11:42   6   the very near future.  Take care.

        7        (Hearing adjourned at 11:42.)

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10 United States.

11     Certified to by me this 29th day of March 2021.

12
                          */s/ Kristie M. Davis*
13                        KRISTIE M. DAVIS
                          Official Court Reporter
14                        800 Franklin Avenue
                          Waco, Texas 76701
15                        (254) 340-6114
                          kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25